Jay Wesley NEILL, Appellant

v.

STATE of Oklahoma, Appellee.

No. F–92–975.

Court of Criminal Appeals of Oklahoma.

Oct. 13, 1994.

Rehearing Denied June 27, 1995.

---

Jim Pearson, Oklahoma City, for appellant at trial.

Don J. Gutteridge, Jr., Oklahoma City, for appellant at trial and on appeal.

Robert Schulte, Dist. Atty., Eddie Valdez, Asst. Dist. Atty., Lawton, for the State at trial.

Susan Brimer Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, for the State on the appeal.

## OPINION

LUMPKIN, Presiding Judge:

Appellant Jay Wesley Neill was tried by jury and convicted of four counts of Murder in the First Degree (21 O.S.1981, § 701.7.), three counts of Shooting with Intent to Kill (21 O.S.1981, § 652), and one count of Attempted Shooting with Intent to Kill (21 O.S.1981, § 652), Case No. CRF–84–597, in the District Court of Comanche County. The jury found the existence of three aggravating circumstances and recommended the punishment of death for each count of Murder, and twenty (20) years imprisonment on each count of Shooting with Intent to Kill and Attempted Shooting with Intent to Kill. The trial court sentenced accordingly. From these judgments and sentences Appellant has perfected this appeal.[1]

Appellant was found guilty of committing the murders of Kay Bruno, Jerri Bowles, and Joyce Mullenix during the robbery of the First Bank of Chattanooga in Geronimo, Oklahoma, (hereinafter referred to as the Geronimo Bank), on December 14, 1984. All three (3) victims were bank employees. Appellant was also found guilty of killing bank customer Ralph Zeller. During the robbery three other customers, Bellen and Reuben Robles, and Marilyn Roach were shot and severely wounded. For these offenses, Appellant was found guilty of three (3) counts of shooting with intent to kill. Appellant was also convicted of the attempted shooting of the Robles' fourteen month old daughter, Marie. At trial, Appellant did not contest guilt but focused his defense on the punishment stage of trial. Testifying in his own behalf, Appellant set forth the events comprising the robbery and murders, expressed his remorse for the families of the victims and asked the jury to impose punishment as life in prison without the possibility of parole instead of the death penalty.

During the fall of 1984, Appellant and Robert Johnson shared an apartment in Lawton, Oklahoma. Appellant attempted to support the both of them but had difficulty keeping a steady job. The men soon began to experience financial difficulties. In an attempt to cut expenses, they shared the apartment with Rhonda Neff and her husband. An agreement was reached whereby Ms. Neff would purchase the groceries and Appellant and Johnson would pay the rent. Appellant was unable to comply with his part of the agreement, and they fell behind in their rent. Appellant also fell behind in payments on a rental television and the utilities. Telephone service was discontinued to the apartment. Appellant purchased a car in September 1984, taking out a loan with General Motors Acceptance Corporation. That loan soon became delinquent. Appellant was also delinquent on a loan from Geronimo Bank.

Appellant and Johnson had a joint checking account at the Geronimo bank. It was not in good standing; numerous checks written on the account had been returned due to insufficient funds. Appellant and Johnson

---

1. This appeal is lodged from the re-trial of Appellant on the charges stemming from the bank robbery and murder occurring at the First Bank of Chattanooga in Geronimo, Oklahoma, December 14, 1984. The judgments and sentences rendered in the first trial were reversed and remanded for a new trial as the result of the improper joinder for trial of Appellant and co-defendant Robert Grady Johnson. See *Neill v.* *State*, 827 P.2d 884 (Okl.Cr.1992). In a separate re-trial, co-defendant Johnson was found guilty and sentenced to life imprisonment without the possibility of parole. The Appellant in this case was sentenced on September 29, 1992, after the retrial. The case was fully briefed and submitted to the Court on January 31, 1994, and oral arguments were held July 7, 1994.

were at the bank frequently attempting to work out their money problems.

The Geronimo Bank was a small facility, housed in a prefabricated building. It usually had only two tellers and no surveillance cameras or security guards. Appellant commented on more than one occasion on the absence of the security measures and how easy he thought it would be to rob the bank.

On December 12, 1984, Appellant visited a local pawnshop and inquired about the purchase of a gun. He indicated to the clerk that he needed the gun for protection as he had been receiving threatening phone calls. Different types of guns were described to him and he was told that he must have a gun permit from the police department in order to purchase a gun. It was explained that in order to obtain a gun permit, an individual must be at least twenty-one (21) years old. Appellant was nineteen (19) years old.

The next day, December 13, 1984, Appellant and Johnson purchased two hunting type knives at a local discount store. They initially looked at purchasing a gun, but when informed the guns in that store were not real, they purchased the knives. That morning, Appellant talked with a travel agent at the Lawton Municipal Airport. He originally wanted a flight to Nassau leaving after 6:00 p.m. Friday December 14th. When told there was not a flight available, he requested one to San Francisco leaving after 5:00 p.m. that Friday. Appellant also inquired into hotel accommodations, specifically executive suites, and limousine service. When asked for payment, Appellant said he would pay in cash on Friday.

At approximately 11:30 a.m. on December 13th, twenty-one (21) year old Robert Johnson applied for a gun permit from the Lawton Police Department. At approximately 1:15 p.m. Appellant and Johnson walked into the Geronimo Bank. They stayed only a few minutes, not conducting any business but just looking around.

On Friday, December 14, 1984, at approximately 10:00 a.m., Appellant and Johnson, returned to the pawn shop and asked for a revolver seen on a previous visit. They were shown how to load and fire the gun and told the type of ammunition used and where it could be purchased. Appellant held the gun up and clicked it several times. They told the clerk they were to get the gun permit by 2:30 p.m. that afternoon and would be back then to purchase the gun.

They picked up the gun permit early, at approximately 11:30 a.m., and returned to the pawn shop at approximately 12:25 p.m. to purchase the gun. They were in a hurry to fill out the appropriate forms and pick up the revolver. Ammunition was then purchased at a local discount store. However, when placed in the gun it did not fit. The gun had been mistakenly marked as a .38 when it was actually a .32 caliber. So, the .38 caliber shells purchased were exchanged for .32 caliber shells. Between 12:30 and 1:00 p.m. Appellant hurriedly purchased lunch from a local drive-in restaurant. At approximately 12:45 p.m., Johnson went to a neighbors apartment to use the telephone. He rescheduled their travel plans for an earlier flight, leaving at approximately 2:30 p.m. that afternoon.

Shortly after 1:00 p.m., Appellant entered the Geronimo Bank.[2] Bank employees Kay Bruno, Jerri Bowles and Joyce Mullenix were herded to a back room, forced to lie face down on the floor and stabbed to death. At the front of the bank, Bellen Robles had entered in order to deposit a check. Finding the teller windows empty, she looked down the hallway to the back room. There she saw the back of a man as he bent over something. She went outside to tell her waiting husband, Reuben, that she thought the bank was being robbed. He doubted this and went inside the bank with his wife and their fourteen (14) month old daughter. Entering the bank just behind them was local farmer, Ralph Zeller. Barely inside the front door, they were greeted with a gun pointed at them and told to go to the back room if they wanted to live. Once in the

2. The evidence as to whether Robert Johnson accompanied Appellant into the bank is controverted. Appellant testified during the second stage of trial that Johnson was at home waiting on him during the robbery. However, he had previously maintained that Johnson was with him in the bank. Marilyn Roach testified to hearing the voices of 2 men inside the bank.

back room they were directed to lie down on the floor.

The Robles and Mr. Zellner were left in the back room while Appellant went up to the front of the bank to sack up the money. While he was doing so, another customer, Marilyn Roach entered the bank. Appellant pointed the gun at her and forced her to the back room. She was barely able to lie down inside the small, now crowded, room. Moments later the gunshots rang out. Mrs. Roach was shot twice in the head. Bellen and Ruben Robles were each shot once in the head. Turning his head to keep the blood out of his eyes, Ruben Robles saw the gun pointed at his baby daughter and heard it click. But no shots were fired; the gun was empty.

At approximately 1:25 p.m., Pam Matthews arrived at the Geronimo Bank to find it empty. Money wrappers were on the floor. The only sound she heard was that of a baby crying. She followed the sound to the back room and saw the victims. Calling out to see if anyone was alive, she ran to the cafe across the street and said the bank had been robbed. A patron in the restaurant, Calvin Bowles, had just been in the bank shortly before 1:00 p.m. to cash a check and visit with his nineteen (19) year old daughter Jerri. After talking with his daughter for a few minutes he left for the cafe. Shortly thereafter he heard Ms. Matthews' cries of robbery and was one of the first to arrive at the bank. In addition to the discovery of the victims in the bank, Appellant's bank file was found open on Kay Bruno's desk.

Appellant and Johnson arrived at the Lawton Airport at approximately 2:30 p.m. They paid one thousand two hundred dollars ($1,200.00) in cash for their tickets and boarded the plane; carrying only a tote bag. Appellant had left a note back at the apartment for Rhonda Neff. In it he said he and Johnson had gone to Georgia. That evening, neighbors received a phone call from Appellant saying he was in Georgia and asking if anything exciting had happened in Lawton. The neighbor did not think to tell him about the robbery. He called her back on Sunday evening and again asked if anything was going on in Lawton. She asked where he

was and for the phone number. Telling her he was in Georgia, he gave her the phone number to his San Francisco hotel. Appellant phoned another friend Sunday evening, and asked her the same questions. She told him about the robbery and murders. When asked if there were any suspects, Appellant was told of a composite drawing made by the FBI. The friend said the composite picture fit Appellant to a "t".

Appellant and Johnson were arrested in San Francisco Monday December 17, 1984. Much of the money taken in the robbery was marked bills. The serial numbers on the money used to pay for hotel rooms, limousine rides and shopping excursions matched that on the "bait list", i.e. the list of serial numbers on the marked bills. When Appellant was arrested, he had approximately one thousand nine hundred dollars ($1,900.00) in his pants pocket and another one thousand eight hundred dollars ($1,800.00) was found inside his hotel room.

## JURY SELECTION ISSUES

### A.

█ In his first assignment of error, Appellant attacks the State's use of peremptory challenges to exclude four (4) black venirepersons. In *Batson v. Kentucky*, 476 U.S. 79, 98, 106 S.Ct. 1712, 1724, 90 L.Ed.2d 69 (1986), the Supreme Court held that a defendant can raise an equal protection challenge to the use of peremptory challenges at his own trial by showing that the prosecutor used the challenges for the purpose of excluding members of the defendant's own race from the jury panel. *Id.* at 96, 106 S.Ct. at 1718, 90 L.Ed.2d at 87. Subsequently, in *Powers v. Ohio*, 499 U.S. 400, 409, 111 S.Ct. 1364, 1369–70, 113 L.Ed.2d 411, 424 (1991), the Court extended this holding to the exclusion of any venireperson solely on the basis of race, even if they were not the same race as the defendant. It is upon *Powers* that Appellant relies in-as-much as he and all of his victims were all members of the same race. In *Powers*, the Supreme Court left it to the trial courts to develop rules to prevent peremptory challenges from being used "as a mask for race prejudice." *Id.* at 416, 111 S.Ct. at 1374. This Court and the trial

courts in this State have adopted the strictures set forth in *Batson v. Kentucky*.[3]

*Batson* establishes a three (3) part analysis: 1) the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race; 2) after the requisite showing has been made, the burden shifts to the prosecutor to articulate a race neutral explanation related to the case for striking the juror in question; 3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. The Court noted the race neutral explanation by the prosecutor need not rise to the level justifying excusal for cause, but it must be a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges. *Id.* 476 U.S. at 98, n. 20, 106 S.Ct. at 1723, n. 20. The trial court's findings as to discriminatory intent are entitled to great deference. *Id.* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. *See also Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). Therefore, we review the record in the light most favorable to the trial court's ruling. *Black v. State*, 871 P.2d 35, 43 (Okl.Cr.1994).

Assuming arguendo Appellant made a prima facie showing,[4] the prosecutor offered race neutral explanations in rebuttal for striking from the panel Mrs. Jones, Mrs. Lovick, Mrs. Jackson and Mr. Evans. "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror.

At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. at 360, 111 S.Ct. at 1866, 114 L.Ed.2d at 406. The State used its first peremptory challenge to excuse Mrs. Jones. The prosecutor explained that he was "leery about her close religious affiliation" (her husband was a minister), that she was a school teacher and "school teachers historically.... tend to be forgiving in nature", that her austere type of dress made him uncomfortable and that she adamantly shook her head up and down when the issue of the evidence necessary to return a guilty verdict was discussed during Appellant's voir dire. On its face, this explanation does not reveal an intent to discriminate against the potential juror on account of race. Appellant's religious beliefs, admittedly acquired since the commission of the crimes, were an issue in the second stage of trial. The State's impression that the juror would be sympathetic to Appellant's beliefs was a legitimate, race-neutral reason to strike the juror.

The State's third peremptory challenge was used to excuse Mrs. Lovick. The prosecutor explained that Mrs. Lovick's prior contacts with the district attorney's office had been antagonistic. She had been charged with a peace bond violation and with intimidation of a witness. Neither charge resulted in a conviction.[5] The prosecutor's

3. In as much as *Batson* requires a race neutral explanation and *J.E.B. v. Alabama*, — U.S. —, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) requires a gender neutral explanation for the exercise of a peremptory challenge, our statutory definition of peremptory challenges is inaccurate. See 22 O.S.1991, § 654 (peremptory challenges are those objections "for which no reason need be given").

4. The trial court's ruling indicates that Appellant did not make a prima facie case that the prosecutor exercised peremptories on the basis of race. The Court stated:

... I will take judicial notice of the fact that this particular juror is black. I will not take judicial notice that he has stricken every black from the panel. Other blacks and other minorities have hit the panel, including Spanish,

which have gone off either for cause—I believe for cause mainly.... (Tr. 465).

Whether or not the trial court ruled that Appellant had or had not made a prima facie showing of intentional discrimination need not concern us. "Once a prosecutor has offered a race neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. at 359, 111 S.Ct. at 1866, 114 L.Ed.2d at 405.

5. Appellant objected to the use of the peremptory challenge on these grounds explaining that no proof had been offered to support the prosecutor's statements. The trial court noted that it had overruled a previous defense motion for the State to provide any information on potential

belief that Mrs. Lovick may well have been prejudiced against the State was a sufficient race neutral explanation. A hostile attitude toward law enforcement has been held a legitimate reason to exclude a potential juror. *See Moss v. Montgomery,* 588 So.2d 520 (Ala. Cr.App.1991).

 Mrs. Jackson was also excused from the panel with the explanation that she appeared to have her mind already made up against the State, that she had a stern look on her face and would not maintain eye contact with the prosecutor, and that she was "independent and haughty" in her actions. Body language can be a valid race neutral explanation under certain circumstances. *See Avery v. State,* 545 So.2d 123, 127 (Ala. Cr.App.1988). If one potential juror is struck for this reason, the explanation carries more weight. However, if more than one potential juror is struck, the explanation is weakened. In the present case, Mrs. Jackson was the only venireperson challenged by the State for this reason. A review of her voir dire in its entirety reveals a manner that was somewhat hostile and less than respectful to the State. The fact a potential juror would not be very receptive to the State's theory of the case and even hostile to the prosecution is a sufficient race neutral explanation for preempting the juror off the panel.

 Mr. Evans was excused from the panel for the reasons that he retired from the military at a relatively low rank, that he was originally from a large urban area where killings occurred frequently and that his answers and actions indicated that he was taking the trial very lightly. When read in context, the combination of these reasons illustrates an individual who lacked the appreciation for the serious nature of the task to be performed by a juror deciding whether the death penalty should be imposed. These reasons are sufficiently race neutral explanations to pass constitutional muster. *See Allen v. State,* 871 P.2d 79, 90 (Okl.Cr.1994).

 Once the prosecutor offers a race-neutral basis for the exercise of the

peremptory challenge, it is the duty of the trial court to determine if the defendant has established purposeful discrimination. "[I]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." "[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Hernandez v. New York,* 500 U.S. at 365, 111 S.Ct. at 1869, 114 L.Ed.2d at 409. Here, the trial court chose to believe the prosecutor's race neutral explanations for striking the jurors in question, rejecting Appellant's assertion that the reasons were merely a pretext. The trial court's decision on the issue of discriminatory intent will not be overturned unless we are convinced that the determination is clearly erroneous. In the present case, the record reveals that race was simply not an issue. Appellant and all of the victims were members of the same race. No allegations were made that the commission of the offense or the prosecution of Appellant were in any way racially motivated. Therefore, we find no error in the trial court's determination that the prosecutor did not discriminate on the basis of race and that Appellant failed to carry his burden of showing purposeful discrimination.

Appellant further argues the trial court erred in failing to make specific findings regarding the prosecution's use of its peremptory challenges to excuse the above mentioned jurors. The record reflects the trial court did not make specific findings as to the explanations offered by the State for the use of its first, third, fifth and ninth peremptory challenges. While the better approach would have been to make specific findings as the challenges were used, the record shows the trial court fully examined the reasons offered before accepting the State's use of the challenge. Accordingly, this assignment of error is denied.

jurors. The court found it improper to release such information until the first day of the jury term. The State offered to provide the records

on Mrs. Lovick but Appellant did not pursue the issue.

## B.

Appellant contends in his second assignment of error that the trial court erred in failing to excuse for cause prospective jurors Boyle and Hubbard. Appellant argues their preconceived opinions concerning the appropriateness of the death penalty made them unfit to sit as jurors. However, neither of them actually sat on the jury, excused by the Appellant's eighth and ninth peremptory challenges.

Any error in the trial court's refusal to excuse these two potential jurors for cause is harmless in light of Appellant's exercise of peremptory challenges to remove the men. *See Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80, 90 (1988); *Tibbs v. State,* 819 P.2d 1372, 1378–1379 (Okl.Cr.1991). Appellant objected to using peremptory challenges to excuse Boyle and Hubbard and requested additional peremptories. That motion was denied. Inasmuch as Appellant did not specify at trial, nor on appeal, which potential jurors would be removed with additional peremptories, nor has he alleged that the jury which actually heard his case was not fair and impartial, we find Appellant was not prejudiced in any substantial rights by his use of the eighth and ninth peremptory challenges.

In *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the Supreme Court held that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would prevent, or substantially impair, the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851–852. The issue of jurors who would automatically vote for the death penalty was addressed in *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), and *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). In those decisions the Court held that those jurors who will automatically vote for the death penalty "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do

so." *Morgan,* 504 U.S. at ——, 112 S.Ct. at 2229, 119 L.Ed.2d at 502. Such prospective jurors are to be removed from the jury panel for cause. *Id.* This Court has previously held that we will look to the entirety of the juror's voir dire examination to determine if the trial court's ruling was proper. *See Castro v. State,* 844 P.2d 159, 166 (Okl.Cr.1992); *Davis v. State,* 665 P.2d 1186, 1194 (Okl.Cr. 1983), *cert. denied* 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983). As the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion. *Rojem v. State,* 753 P.2d 359, 363 (Okl.Cr. 1988).

Upon questioning by the State, Mr. Boyle indicated he believed in the death penalty and could, if the law and evidence warranted, consider a verdict imposing the death penalty, that he would wait until deliberations to make the determination as to the proper punishment in this case and that he would consider all the evidence in reaching his verdict. When questioned by the defense, Mr. Boyle stated he had done some research into the question of the death penalty, on a case by case basis, and determined that premeditated murder was the only crime for which the death penalty would be appropriate punishment. When asked whether a guilty verdict in Appellant's case would be the type of homicide for which the death penalty would be appropriate, Mr. Boyle stated he would have to hear the testimony of the witnesses before he could decide. When pressed, he agreed with counsel's restatement of his responses that the death penalty was the only appropriate punishment for any person found guilty of pre-meditated murder. Upon further voir dire by the State, Mr. Boyle indicated that if the Appellant was found guilty of premeditated murder, he would not automatically give him the death sentence, he would have to listen to the evidence. He admitted there was evidence he would consider to determine whether death, life in prison or life in prison without parole was the appropriate punishment. Mr. Boyle stated he could keep an open mind until he heard all the evidence and that he could consider all three penalties.

When asked by defense counsel whether any sentence other than the death penalty would be appropriate in a case where four people were found to have been murdered in a premeditated manner, Mr. Hubbard responded "Not really. If they were premeditated." When asked by the State if he would automatically vote for the death penalty in a case where the jury found the murder of four people was premeditated, Mr. Hubbard answered, "That's close, yes." Upon further voir dire by the State, Mr. Hubbard stated he had never been a juror before, he did not know what mitigation evidence the Appellant would offer, he would listen to any evidence presented, and he could consider as punishment life imprisonment, life imprisonment without parole and the death penalty. When asked by defense counsel if there was any kind of mitigation he would consider, Mr. Hubbard stated that "just off the top of [his] head, if a person was proven mentally incompetent." The trial court denied the Appellant's challenge for cause finding the juror never wavered from his statement that he could consider any mitigating evidence offered and would consider all three possible punishments.

This Court has held that the only legitimate concern is whether each member of the jury is willing to consider all the penalties provided by law and not be irrevocably committed before the trial has begun. *Duvall v. State*, 825 P.2d 621, 630 (Okl.Cr.1991); *Banks v. State*, 701 P.2d 418, 421–422 (Okl. Cr.1985); *Davis v. State*, 665 P.2d 1186, 1190 (Okl.Cr.1983), *cert. denied* 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983). A review of the entire voir dire inquiry of Mr. Boyle and Mr. Hubbard reveals that neither man was predisposed to impose the death penalty. We find the responses given by both Mr. Boyle and Mr. Hubbard showed that neither was irrevocably committed to vote for the death penalty regardless of the law and that each stated his views about capital punishment would not have prevented or substantially impaired his performance as a juror in

accordance with his instructions and oath. Accordingly, this assignment of error is denied.

### C.

In his third assignment of error Appellant contends the trial court erred in overruling defense motions for individual sequestered voir dire and for a sequestered jury. Appellant argues the court's ruling denied him a fair trial given the nature of the crime, the small size of the town of Lawton and the fact that the death penalty was being sought. However, Appellant fails to support this claim of prejudice with any reference to the record. This Court has consistently held that the burden is upon the appellant to establish to the appellate court the fact that he was prejudiced in his substantial rights by the commission of an alleged error. *Cook v. State*, 650 P.2d 863, 868 (Okl.Cr.1982). Appellant has failed to meet that burden in this case. *See Duvall v. State*, 825 P.2d 621, 632 (Okl.Cr.1991).

As legal authority for his argument Appellant relies on *Evans v. State*, 26 Okl.Cr. 9, 221 P. 794 (1924)[6]. This case is distinguishable from the present case and does not support Appellant's argument. *Duvall v. State*, 825 P.2d at 632. In *Evans* this Court found merit to the appellant's argument that the trial court erred in refusing the defendant's request to have the jury placed in charge of a sworn officer and in permitting the jury to separate during trial and after the instructions had been issued and closing arguments made. The Court found that appellant had supported his claim of prejudice by proof that the jury mingled with several relatives and friends of the deceased during every recess and adjournment and were thereby exposed to improper influences and prejudices existing outside the courtroom. In arriving at this conclusion, the Court discussed the history of sequestering a jury and noted that in capital cases, the jurors should not be permitted to separate after they have

---

6. Appellant also argues that *Evans* is cited with approval in *Tomlinson v. State*, 554 P.2d 798, 803 (Okl.Cr.1976). However, *Evans* is cited only for the proposition that submission of the cause to the jury at the close of argument refers to separation of the jurors after they have been charged by the trial court and after opposing counsel have made their closing arguments. Such is not at issue in the present case.

been sworn, where one of the parties objected to the separation. The Court further stated:

> While the law allows a separation of the jury with the permission and under proper admonition of the court at any time before the submission of the cause, yet we believe that in the exercise of sound judicial discretion, the trial court in a capital case should not refuse a request from either party to place the jury in charge of sworn officers during the progress of the trial. *Armstrong v. State*, 2 Okl.Cr. 566, 99 Pac. 658, 24 L.R.A. (N.S.) 776.

We continue to adhere to the well established rule that it is within the trial court's discretion whether to allow the jury to separate or to sequester them. *Ferguson v. State*, 51 Okl.Cr. 381, 1 P.2d 830, 832 (1931). See *Price v. State*, 782 P.2d 143, 147–148 (Okl.Cr.1989); *Carson v. State*, 529 P.2d 499, 503 (Okl.Cr.1974); *Thompson v. State*, 73 Okl.Cr. 72, 118 P.2d 269, 272 (Okl.Cr.1941). See also 22 O.S.1991, § 853. In *Price*, we held that an abuse of discretion will be found only where appellant shows, by clear and convincing evidence, that the jurors were specifically exposed to media reports which were prejudicial to the appellant. 782 P.2d at 147. We also find that an abuse of discretion will be found where appellant shows, by clear and convincing evidence, that the jurors were exposed to specific improper influences which were prejudicial to appellant.

Here, no proof has been offered of any prejudice. The record is also void of any evidence, much less clear and convincing evidence, that the failure to sequester the jury resulted in their exposure to any improper influences or that they were affected by any passions or prejudices existing outside the courtroom. Each juror sworn testified that he or she could be fair and impartial. Appellant has failed to meet his burden of showing that he was prejudiced in any way by the court's ruling. To the extent that *Evans v. State* is inconsistent with this ruling, it is hereby overruled.

Further, whether private individual voir dire should be conducted is a matter of discretion of the trial court. *Morrison v. State*, 619 P.2d 203 (Okl.Cr.1980). In *Romano v. State*, 847 P.2d 368, 376 (Okl.Cr.1993), we quoted to *Foster v. State*, 714 P.2d 1031, 1037 (Okl.Cr.1986), cert. denied 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986) and stated:

> [a]lthough such a practice may be allowed by a trial judge, it is an extraordinary measure ... Unless the danger of prejudicing the jurors by exposure to damaging information is a grave problem or some special purpose would be served, it is unlikely that individual voir dire would be justified. We find no abuse of discretion in not allowing the procedure.

Nor do we find any abuse of discretion in this case. The record reflects that both the State and the defense conducted an extensive voir dire examination. We are unable to discern any purpose for sequestering the venire and it does not appear that Appellant was prejudiced by not questioning the venire individually. *Sellers*, 809 P.2d at 682; *Fox*, 779 P.2d at 568; *Vowell v. State*, 728 P.2d 854, 857 (Okl.Cr.1986). Therefore, this assignment of error is denied.

### FIRST STAGE TRIAL ISSUES

#### A.

During the guilt stage of trial, evidence was introduced showing that Appellant and co-defendant Johnson traveled to San Francisco immediately after committing the robbery and murders. Until the time they were apprehended, approximately three (3) days later, Appellant and Johnson rented a limousine, stayed in luxury accommodations, visited nightclubs and generally went on a spending spree. This spending spree included Appellant's purchase and use of cocaine. In his fourth assignment of error, Appellant argues admission of the purchase and use of cocaine was improper evidence of other crimes which in no way was connected to the murder and shooting with intent charges and was more prejudicial than probative. In his fifteenth assignment of error, he argues evidence of his activities in general in San Francisco was not relevant and was inflammatory.

This Court has held that evidence of other crimes may be admissible where they form a

part of an "entire transaction" or where there is a "logical connection" with the offenses charged. *Dunagan v. State*, 734 P.2d 291, 294 (Okl.Cr.1987); *Bruner v. State*, 612 P.2d 1375 (Okl.Cr.1980). This "res gestae" exception differs from the other listed exceptions to the evidence rule; in that in the listed exceptions, the other offense is intentionally proven, while in the res gestae exception, the other offense incidentally emerges. *Dunagan v. State*, 755 P.2d 102, 104 (Okl.Cr.1988). "Evidence of another crime will not be excluded where, as here, it incidentally emerges as events are revealed in their natural sequence." *Shelton v. State*, 793 P.2d 866, 871 (Okl.Cr.1990).

██ Here, evidence of Appellant's purchase and use of cocaine emerged as the State set forth the full story of the offenses occurring at the First Bank of Chattanooga on December 14, 1984. The proceeds from the bank robbery were used to fund the trip to San Francisco and the spending spree which ensued. Used in this spending spree were specially marked bills which lead in part to Appellant's apprehension by the authorities. This Court has specifically upheld the admission of other crimes evidence when the other offenses were crimes which led to the appellant's apprehension and arrest. *Salazar v. State*, 852 P.2d 729, 736 (Okl.Cr. 1993). The commission of the bank robbery and murders and Appellant's apprehension occurred within a span of three (3) days. Evidence of the events occurring in San Francisco were so closely related to the bank robbery and murders that they formed a logical connection with the charged offenses so as to be relevant evidence.

Further, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice or harmful surprise. See 12 O.S.1991, § 2403. The State included this evidence in its pre-trial Notice of Evidence of Other Crimes, *see Burks v. State*, 594 P.2d 771, 772 (Okl.Cr. 1979), *overruled in part on other grounds, Jones v. State*, 772 P.2d 922 (Okl.Cr.1989),[7] and the trial court instructed the jury on the limited use of this evidence.[8] Therefore, we find this evidence was properly admitted at trial.

**B.**

In his fifth assignment of error, Appellant argues the trial court erred in admitting photographs of the victims and crime scene which were more prejudicial than probative. Appellant argues that as he did not contest guilt, the only reason for admitting the photographs was to inflame the passions of the jury.

 It is well settled that the admissibility of photographs is a matter within the trial court's discretion. Absent an abuse of that discretion, this Court will not reverse the trial court's ruling. *Williamson v. State*, 812 P.2d 384, 400 (Okl.Cr.1991), *cert. denied* 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). Photographs are admissible if their content is relevant and unless their probative value is substantially outweighed by their prejudicial effect. *Smith v. State*, 737 P.2d 1206, 1210 (Okl.Cr.1987), *cert. denied,* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1988); 12 O.S.1981, § 2403.

██ Twenty-one different color photographs were introduced in this case. Five (5) depicting the crime scene and sixteen (16) illustrating the victims' wounds. Appellant's argument that the photos were not relevant as the cause of death was not contested was addressed and rejected in *Williamson v. State*, 812 P.2d at 400. While the defendant may not contest the victim's cause of death, it remains the State's burden to prove, first,

---

7. This type of evidence is generally exempted from the *Burks* requirement of pretrial notice. *Burks v. State*, 594 P.2d at 774. *See also Bruner v. State*, 612 P.2d 1375, 1377 (Okl.Cr.1980),

8. Instruction No. 29 provided:
 Evidence has been received that the defendant has allegedly committed offenses other than that charged in the information. You may not consider this evidence as in any way tending to prove the guilt or innocence of the defendant of the specific offense charged in the information. This evidence has been received solely on the issues of the defendant's alleged motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. This evidence is to be considered by you only for the limited purpose for which it was received.

the corpus delicti, and second, that the crime was committed by the accused. Pictures of the murder victim are always useful in establishing the corpus delicti of the crime.

Further, the probative value of photographs of murder victims can be manifested numerous way including, as in the present case, showing the nature, extent, and location of wounds, depicting the crime scene, and corroborating the medical examiner's testimony. *Moore v. State*, 736 P.2d 161, 164 (Okl.Cr.1987), *cert. denied*, 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987); *Robison v. State*, 677 P.2d 1080, 1087 (Okl.Cr. 1984). The fact that the pictures are gruesome does not of itself cause the photographs to be inadmissible. As we stated in *McCormick v. State*, 845 P.2d 896, 898–899 (Okl.Cr. 1993):

> ... there is no requirement that the visual effects of a particular crime be down played by the State. Gruesome crimes result in gruesome pictures. The only consideration to be made is whether the pictures are unnecessarily hideous, such that the impact on the jury can be said to be unfair. The pictures admitted were graphic, as are most pictures of dead, murdered bodies; however, as was true in *Thomas v. State*, 811 P.2d 1337, 1345 (Okl.Cr.1991), the pictures 'were not so repulsive as to be inadmissible.'

Contrary to Appellant's claim, we do not find the photos so repetitious as to be prejudicial. This Court has held that there is a point in the display of relevant photographs where the photographs are so duplicative that a needless repetition can inflame the jury and result in error. *President v. State*, 602 P.2d at 226. The burden is on the Appellant to prove that he was injured by the error. *Barr v. State*, 763 P.2d 1184, 1187 (Okl.Cr.1988); *Harrall v. State*, 674 P.2d 581, 583 (Okl.Cr.1984). The photos in the present case accurately reflected the injuries inflicted upon four (4) different victims. The photos were taken by the medical examiner prior to the autopsy. As the photos corroborate the medical examiner's testimony and illustrate the wounds received by the victims, we find their probative value is not substantially out-weighed by any prejudicial effect. Accordingly, this assignment of error is denied.

## C.

Appellant was charged in the felony information in part with the commission of first degree murder with malice aforethought and/or in the commission of an armed robbery. In his sixth assignment of error, Appellant contends the trial court erred in overruling his motion to compel the State to elect between which alternative theories of guilt would be relied on at trial. In *Munson v. State*, 758 P.2d 324, 332 (Okl.Cr.1988), we held that where the offense may be committed by the use of different means, the means may be alleged in the alternative in the same count. In the case now before us, the murder could have been committed in either or both ways alleged. Therefore, we do not find any error in charging the Appellant in the information under one count and in the alternative.

Appellant further argues he was denied due process of law and conviction by a unanimous verdict because the jury was not instructed to find unanimously that he had committed first degree murder either with malice aforethought or during the course of an armed robbery. This same argument was addressed and rejected by this Court in *James v. State*, 637 P.2d 862, 865 (Okl.Cr. 1981). Appellant so acknowledges and asks this Court to reconsider its position. We decline.

We note that Appellant has waived all but plain error review by his failure to object to the verdict forms submitted to the jury. In fact, counsel specifically stated he had reviewed the instructions and had "no objections" and he had reviewed the verdict forms and found them to be "proper." Therefore, by failing to bring any potential error to the attention of the trial court and allow for a possible remedy, Appellant has not properly preserved the issue for appellate review. *Munson v. State*, 758 P.2d at 332; *Reams v. State*, 551 P.2d 1168, 1170 (Okl.Cr.1976).

Assuming arguendo, the issue is properly before this Court. In *James*, we

held that failure of a jury to indicate the basis of their finding of guilt was not error where there was a single crime charged, that is first degree murder. Whether or not it was committed with malice aforethought, or during the commission of a felony goes to the factual basis of the crime. The jury verdict was unanimous that the appellant committed the crime: such a verdict satisfies due process. No due process violation occurred as all of the elements of the crime charged were proven. *See Wilson v. State,* 737 P.2d 1197 (Okl.Cr.1987); *Plunkett v. State,* 719 P.2d 834 (Okl.Cr.1986).

In the present case, Appellant was charged in the alternative with the commission of malice aforethought murder or murder during the commission of an armed robbery. As the State did prove both premeditation and felony-based murder, this Court finds that the failure of the jury to indicate the basis of their finding of guilt was not error.

### SENTENCING STAGE ISSUES

#### A.

In his seventh assignment of error, Appellant contends the admission of second stage testimony from the victims' relatives denied his right to a fair sentencing proceeding. This testimony came from the husband of Kay Bruno, the husband of Joyce Mullenix and the father of Jerri Bowles and concerned the loss of each victim and the impact of that loss on family members. The State provided prior notice to Appellant of the use of this evidence and the defense entered an objection at trial.

In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court specifically approved this type of victim impact evidence stating that "[in] the majority of cases, ... victim impact evidence serves entirely legitimate purposes." *Id.* at 825, 111 S.Ct. at 2608. The Court declared that "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's

decision as to whether or not the death penalty should be imposed." *Id.* at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736. Victim impact evidence is constitutionally acceptable so long as it is not "so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825, 111 S.Ct. at 2608. One year after the *Payne* decision, the Oklahoma Legislature specifically provided for the admission of victim impact evidence in sentencing considerations. See 22 O.S.Supp.1992, §§ 984, 984.1, and 991a(C).

Appellant now argues on appeal that admission of this type of evidence in his case is an ex post facto application of the law and a due process violation. We disagree. The Oklahoma statutes concerning the admission of victim impact evidence went into effect approximately two (2) months prior to Appellant's trial.[9] Therefore, the new statutes could be properly used in Appellant's case. Further, application of the new statutes was not an ex post facto violation as the statutes did not alter "any substantial personal rights but merely change[d] modes of procedure which [did] not affect matters of substance." *Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351, 360 (1987). They did not increase the punishment which the Appellant was to face, nor did they make criminal an act which was not criminal at the time of its commission; the new statutes were merely procedural. *Id.* See also *Barnes v. State,* 791 P.2d 101, 103 (Okl.Cr.1990). Therefore, they were properly applied to Appellant.

Appellant alleges these new statutes give prosecutors, judges and juries "completely unfettered discretion regarding the admission and consideration" of victim impact evidence. To the contrary, we find these statutes set forth specific guidelines as to the use of this evidence. The terms used in this new procedure, "victim impact statement", "members of the immediate family" and "violent crimes" are set forth in § 984. Sections 984.1 and 991a(C) proscribe the admission and use of this evidence. These

---

9. 22 O.S.Supp.1992, §§ 984, 984.1, 991a(C) went into effect July 1, 1992. Appellant was re-tried September 21–29, 1992.

statutes, taken together with the parameters outlined in *Payne v. Tennessee,* provide sufficient notice and guidance in the application of victim impact evidence. As with any evidence, the weight to be given this evidence, is for the trier of fact to determine. Accordingly, we find the victim impact evidence was properly admitted during the sentencing stage of trial.

### B.

For his eighth assignment of error, Appellant challenges the jury instruction addressing the aggravating circumstance of "especially heinous, atrocious or cruel". The instruction, No. 11, recited the language of Oklahoma Uniform Jury Instruction—Criminal (OUJI–CR) No. 436. Appellant argues the second paragraph does not limit the unconstitutionally vague definitions contained in the first paragraph of the instruction. This allegation of error will be reviewed only for plain error as Appellant failed to object to the giving of instruction No. 11. The record reflects that Appellant offered written prepared instructions to the court and took exception to their rejections, but he specifically stated he had no objections to the instructions the court intended to give.

In *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the United States Supreme Court held that the aggravating circumstance of "especially heinous, atrocious or cruel" was unconstitutionally vague as applied in that case. The Court expressed approval of a definition which would limit application of the aggravating circumstance to murders involving "some kind of torture or serious physical abuse." 486 U.S. at 365, 108 S.Ct. at 1859, 100 L.Ed.2d at 382. Such a limitation was adopted by this Court in *Stouffer v. State,* 742 P.2d 562, 563 (Okl.Cr.1987) (Opinion on Rehearing), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988).

In *Cartwright,* the jury had been given only one of the two paragraphs of the OUJI–CR No. 436 and did not include the limiting factors. In the present case, the jury was given both paragraphs. This instruction cures the constitutional infirmities identified in *Maynard* and embodies the limi-

tations which the sentencer must consider in the application and finding of this particular aggravating circumstance. *See Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). We have re-examined these principles on several occasions and have since consistently applied the narrow construction discussed above. *See Romano v. State,* 847 P.2d 368, 386 (Okl.Cr.1993); *Thomas v. State,* 811 P.2d 1337, 1348 (Okl.Cr. 1991). Accordingly, we find that this particular aggravating circumstance was applied in a constitutional manner in the present case.

### C.

Appellant argues in his ninth assignment of error that this Court's attempt to narrow the construction of the "especially heinous, atrocious or cruel" aggravating circumstance is a violation of the separation of powers doctrine, impermissibly intruding upon the province of the legislature. Appellant contends the time has come to declare the aggravating circumstance unconstitutionally vague and overbroad.

In *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Supreme Court put limitations on the use of overbreadth to void a statute on its face. The Court advised that declaring a statute facially invalid should be used sparingly and only as a last resort. In *Erznoznik v. Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125, 135 (1975), the Court declared that a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts. *See also Pegg v. State,* 659 P.2d 370, 372 (Okl.Cr.1983). Title 21 O.S.1991, § 701.12(4), the statute setting forth the aggravating circumstance of "especially heinous, atrocious or cruel" was amenable to such a limiting construction by this Court; a construction endorsed by the United States Supreme Court. *See Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Appellant's reading of the statute in such a way as to render it unconstitutional is neither warranted nor necessary in this case. When this Court is unable to construe a state statute in a consti-

tutionally acceptable manner, then such statute should be struck down. It would then be left up to the Legislature, as Appellant argues, to enact a statute that would pass constitutional muster. It is the courts alone that have the power to determine the validity or invalidity of a statute. *York v. Turpen,* 681 P.2d 763, 767 (Okl.1984). It is the role of the courts to ascertain and give effect to the intention of the legislature as expressed in the statutes. *Hicks v. Freeman,* 795 P.2d 110, 112 (Okl.Cr.1990). To apply the principle of statutory interpretation is not a violation of the separation of powers doctrine. Accordingly, this assignment of error is denied.

### D.

In his tenth assignment of error, Appellant argues, that assuming arguendo the aggravating circumstance of "especially heinous, atrocious or cruel" is valid, the jury's finding is not supported by the evidence. The evidence supporting a finding that the murder was especially heinous, atrocious or cruel requires proof that the death was preceded by torture or serious physical abuse. *Stouffer v. State,* 742 P.2d 562, 563 (Okl.Cr.1987) (Opinion on Rehearing), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988). *See also Fox v. State,* 779 P.2d 562, 576 (Okl.Cr.1989); *Foster v. State,* 779 P.2d 591 (Okl.Cr.1989).

Medical testimony showed that fifteen (15) stab wounds were inflicted upon Jerri Bowles, twenty-seven (27) upon Joyce Mullenix and thirty-three stab (33) wounds upon Kay Bruno. These stab wounds included attempted decapitations. While many of the wounds were shallow, others were quite deep. Stab wounds to the back of Jerri Bowles' neck penetrated so deep as to cause bruises on the front of her neck. Other wounds were so deep as to penetrate a lung, a kidney and the large intestine. Stab wounds to Mrs. Mullenix were so deep as to strike her spine and pierce a rib. Both of Mrs. Bruno's lungs were pierced numerous times. The muscle around the human neck was described as being quite tough. A certain amount of pressure and time would be required to saw through it. Only on Mrs.

Bruno did Appellant attempt the decapitation from both sides of her neck. Each woman lost substantial amounts of blood, Jerri Bowles was found to have lost two (2) of the seven (7) quarts of blood in her body, while Joyce Mullenix lost four (4) quarts of blood. The medical examiner, Dr. Boatsman, testified that only a beating heart could account for such a tremendous loss of blood. He also stated that the chronological order of the stab wounds could not be determined. He opined that the women would have lost consciousness in a matter of minutes—although he could not pinpoint exactly the length of time.

In *Castro v. State,* 745 P.2d 394 (Okl.Cr. 1987), and *Nguyen v. State,* 769 P.2d 167 (Okl.Cr.1988), cases cited by Appellant, this Court found evidence of multiple stab wounds insufficient to support the "especially heinous, atrocious or cruel" aggravator. Those cases are distinguishable from the present case in that no evidence of the victim's physical suffering was introduced into the record. Here, although the length of time which each victim physically suffered is not certain, the injuries were of a serious and painful nature. *See Hale v. State,* 750 P.2d 130, 143 (Okl.Cr.1988). A finding of "especially heinous, atrocious or cruel" could be based upon the evidence of the physical suffering of these victims. However, torture in the context of this aggravating circumstance may take any of several forms. In *Berget v. State,* 824 P.2d 364, 373 (Okl.Cr.1991), we stated that torture may include the infliction of either great physical anguish or extreme mental cruelty.

When used to define a class of defendants against whom the death penalty is sought, torture creating extreme mental distress must be the result of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created. The length of time which the victim suffers mental anguish is irrelevant.

Appellant's own testimony provides the basis for a finding of the extreme mental dis-

tress suffered by the victims prior to their deaths. Although the actual sequence of events is not clear, in describing the scene in the bank, Appellant said he first pointed the gun at Kay Bruno. A stunned Mrs. Bruno pleaded with Appellant to put the gun away and not to harm them. She told him he did not have to do this, that they could work things out. Appellant refused to listen and directed her, Jerri Bowles and Joyce Mullenix to the back room. When Mrs. Bruno hesitated, Appellant shouted at her. Once in the back room, he directed all three women to lay face down with their hands behind their backs. The room was so small that in laying next to each other, the women were practically on top of one another.

Appellant directed Mrs. Bruno to get up and close the blinds and then lay back down on the floor. Mrs. Bruno continued to plead with Appellant to spare their lives and let them try to work something out. She told Appellant they would do anything he wanted; they would open the safe and get the money for him. Appellant threatened to hit her in the head with his gun. He initially stabbed Mrs. Bruno in the back. She grabbed her back where she had been stabbed and cried "I'm dead, I'm dead, I'm dead." Appellant stabbed her in the back repeatedly before turning her over to stab her in the heart. As Appellant stabbed Jerri Bowles, she screamed. To quiet her, Appellant shouted at her and hit her in the head with the gun. He then continued to stab her. Joyce Mullenix was also stabbed in the back and then in the chest. She had defensive wounds to her hands and fingers.

At one point, Appellant left the women, believing them to be still alive, to return to the front of the bank and gather up the money. Having done so, he returned to the back room and attempted at least one decapitation. About this time, Bellen Robles entered the bank. Seeing no one in the front, she looked down the hallway into the back room and saw Appellant, from the back, sitting on someone and appear to be striking

them. Mrs. Robles also heard moaning sounds coming from the back room.

This is ample evidence of the extreme' mental anguish suffered by these three (3) women prior to their deaths. This evidence illustrates the realization by these women that they were going to be harmed and even killed by Appellant. Two (2) of the women suffered the additional mental anguish of hearing their co-workers being savagely murdered and realizing they could be next. The cause of this extreme mental torture was Appellant's intentional actions. The repeated stab wounds, inflicted so deep as to penetrate bodily organs, demonstrates an indifference to the suffering of the victims. The physical suffering of the victims, combined with the depraved manner in which such suffering was inflicted, is sufficient to support a finding that the murders of Jerri Bowles, Joyce Mullenix and Kay Bruno were "especially heinous atrocious or cruel."

As for Ralph Zeller, he entered the bank behind Mr. and Mrs. Robles. He and the Robles were ordered at gunpoint to the back room. Directed to lay down, they were then left while Appellant brought Marilyn Roach to the back room. Upon his return, Appellant shot Mr. Zeller twice in the back of the head. While we have refused to find the existence of this aggravating circumstances in cases where the victim was killed by a single gunshot wound, this case presents a different situation. In *Stouffer v. State*, 742 P.2d 562 (Okl.Cr.1987), and *Sellers v. State*, 809 P.2d 676 (Okl.Cr.1991), the victims were asleep when shot and never regained consciousness. Here, Mr. Zeller was forced to lie in the carnage of the back room while Appellant debated his fate. Mental anguish includes the victim's uncertainty as to his ultimate fate. *See State v. Walton*, 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1989).[10] Our finding of torture is supported by the mental torment of Mr. Zeller prior to the shooting, rather than the events which took place afterwards. *See also Berget v. State*, 824 P.2d at 373. In the present case, the evidence clearly supports a finding of mental anguish

10. Affirmed by the United States Supreme Court as *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct.

3047, 111 L.Ed.2d 511 (1990).

beyond that which necessarily accompanies a killing. Accordingly, the evidence was sufficient to support the "especially heinous, atrocious or cruel" aggravating circumstance.

### E.

■ Appellant challenges certain second stage jury instructions in his next four (4) assignments of error. Initially, he contends the trial court erred in refusing to instruct the jury that, if they were unable to reach a unanimous verdict as to punishment within a reasonable time, they would be dismissed, and the judge would enter a sentence of life imprisonment. See 21 O.S.1991, § 701.11. This contention was rejected in *Brogie v. State*, 695 P.2d 538, 547 (Okl.Cr.1985), wherein we stated such an instruction would amount to an invitation to the jury to avoid its difficult duty to pass sentence on the life of an accused. Therefore, such an instruction is not necessary. *Boltz v. State*, 806 P.2d 1117, 1124 (Okl.Cr.1991).

■ Appellant further finds error in the failure to give an instruction that the jury had the option to return a life sentence, regardless of its findings respecting aggravating and mitigating circumstances. In *Walker v. State*, 723 P.2d 273, 284 (Okl.Cr.1986), *cert. denied* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1987), the appellant claimed error in the refusal to give his requested instruction on "jury nullification". Defined as "the jury's exercise of its inherent 'power to bring in a verdict of [acquittal] in the teeth of both the law and facts'", we found that most courts have uniformly held that a defendant is not entitled to such an instruction. *See also Pickens v. State*, 850 P.2d 328, 339 (Okl.Cr.1993); *Williamson v. State*, 812 P.2d at 410. We find no error in the omission of this instruction in the instant case.

In his thirteenth assignment of error, Appellant contends the trial court did not properly instruct the jury on the law regarding the weighing of the aggravating circumstance and mitigating evidence. In *Romano v. State*, 847 P.2d at 392 we stated:

Specific standards for balancing aggravating and mitigating circumstances are not constitutionally required. *Zant v. Ste-*

*phens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). *See also Walker v. State*, 723 P.2d at 284; *Brogie v. State*, 695 P.2d at 544. The instructions given to the jury properly advised them to weigh the aggravating circumstances against the mitigating evidence. Instructions No. 8 through 12 comprehensively informed the jury that a finding of the aggravating circumstances beyond a reasonable doubt is not by itself enough to assess the death penalty. Rather, the aggravating circumstances must clearly outweigh the mitigating, or death may not be imposed. Similar instructions have passed constitutional muster. *See Davis v. State*, 665 P.2d 1186, 1202 (Okl.Cr.1983).

Instructions Nos. 6–8, 10–12 in the present case met the above standard.

■ Finally, Appellant attacks the "anti-sympathy" instruction given in the first stage and later incorporated into the second stage proceedings. Appellant argues the instruction unconstitutionally precludes the jury's consideration of mitigating evidence and emotional responses to it. The use of this instruction has been specifically upheld in *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). Appellant's argument has been specifically addressed and rejected in *Fox v. State*, 779 P.2d 562, 574–5 (Okl.Cr.1989). *See also Revilla v. State*, 877 P.2d 1143, 1153 (Okl.Cr.1994); *Boyd v. State*, 839 P.2d 1363, 1372 (Okl.Cr.1992); *Smith v. State*, 819 P.2d 270, 279 (Okl.Cr.1991). The instruction given in the instant case was identical to the ones given in *Fox* and *Parks*. Therefore, we find it was not error to give the anti-sympathy instruction.

### *MANDATORY SENTENCE REVIEW*

■ Pursuant to 21 O.S.Supp.1987, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1981, § 701.12. The jury found the existence of three (3) aggravating circumstances: 1) the defendant knowingly created a great risk of death to more than one person; 2) the

**558**

murder was especially heinous, atrocious or cruel; 3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. We find that each aggravating circumstance was supported by sufficient evidence. 21 O.S.1981, § 701.12(2), (4) and (5).

Mitigating evidence was presented through the testimony of two (2) witnesses, *including* Appellant. These witnesses testified that Appellant had never been charged with or convicted of a violent crime; he had confessed his guilt in open court and testified in detail to his involvement; he expressed remorse for the crimes that he committed and asked forgiveness; he was nineteen (19) years old at the time he committed the crimes; and his mental thought processes were affected by the extreme mental distress and emotional disturbance he was suffering in regards to his relationship with Robert Grady Johnson. This evidence was summarized into five (5) factors and submitted to the jury for their consideration as mitigating evidence. Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp. 1987, § 701.13(C), in finding that the aggravating circumstance outweighed the mitigating evidence. Accordingly, we find no error warranting reversal or modification.

JOHNSON, V.P.J., and LANE, CHAPEL and STRUBHAR, JJ., concur.