965 P.2d 955 (1998)
1998 OK CR 33
Kenneth Eugene TURRENTINE, Appellant,
v.
STATE of Oklahoma, Appellee.
No. F-95-1110.
Court of Criminal Appeals of Oklahoma.
May 27, 1998.
Order Denying Rehearing July 14, 1998.
James T. Rowan, Joe Robertson, Oklahoma Indigent Defense, Norman, for appellant at trial.
David Moss, District Attorney, John E. Priddy, Todd W. Singer, Assistant District Attorneys, Tulsa, for the State at trial.
Anne Moore, Oklahoma Indigent Defense, Norman, for appellant on appeal.
W.A. Drew Edmondson, Attorney General of Oklahoma, William L. Humes, Assistant Attorney General, Oklahoma City, for the State on appeal.

*963 OPINION

LUMPKIN, Judge:
¶ 1 Appellant Kenneth Eugene Turrentine was tried by jury and convicted of four (4) counts of First Degree Murder (21 O.S. 1991, § 701.7), Case No. CF-94-2784, in the District Court of Tulsa County. In Counts I, II, and III, the jury found the existence of three (3) aggravating circumstances and recommended the punishment of death. In Count IV, the jury found the existence of two (2) aggravating circumstances and recommended as punishment life imprisonment without the possibility of parole. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.[1]
¶ 2 On June 4, 1994, Appellant killed his sister Avon Stevenson, his girlfriend, Anita Richardson, and her two children, thirteen (13) year old Martise Richardson and twenty-two (22) year old Tina Pennington. Appellant suspected Anita of seeing other men and believed his sister Avon knew about Anita's affairs. He also believed Anita and Avon were cheating him out of money. On June 3, 1994, Appellant sought to retrieve a gun he had given to an ex-wife. She initially refused but turned the loaded .22 caliber gun over to him the next morning.
¶ 3 After retrieving the gun, Appellant went to his sister's home. Appellant confronted his sister with his beliefs and an argument ensued. Appellant's sister apparently laughed in his face and called him a "punk." In response, Appellant placed the gun to her head and fired one shot. She died at the scene.
¶ 4 Appellant then drove to Anita Richardson's home. The two argued and Appellant placed the gun to her head and fired a shot. She died at the scene. Appellant also *964 shot both of Anita's children in the head. After the shootings, Appellant called 911 and admitted to shooting his "ol lady," his kids and his sister. He then went outside to wait for the police to arrive. Upon their arrival, he again confessed to the killings.

JURY SELECTION

A.
¶ 5 In his first assignment of error, Appellant attacks the State's use of peremptory challenges to exclude Mrs. Peel and Mrs. Calamease, two (2) black venirepersons. In Batson v. Kentucky, 476 U.S. 79, 98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that a defendant can raise an equal protection challenge to the use of peremptory challenges at his own trial by showing that the prosecutor used the challenges for the purpose of excluding members of the defendant's own race from the jury panel. Id., 476 U.S. at 96, 106 S.Ct. at 1723-24, 90 L.Ed.2d at 87.
¶ 6 Batson established a three (3) part analysis: 1) the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race; 2) after the requisite showing has been made, the burden shifts to the prosecutor to articulate a race neutral explanation related to the case for striking the juror in question; 3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. The Court noted the race neutral explanation by the prosecutor need not rise to the level justifying excusal for cause, but it must be a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges. Id., 476 U.S. at 98 n. 20, 106 S.Ct. 1712. The trial court's findings as to discriminatory intent are entitled to great deference. Id., 476 U.S. at 98 n. 21, 106 S.Ct. 1712; Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991) (plurality opinion). Therefore, we review the record in the light most favorable to the trial court's ruling. Neill v. State, 896 P.2d 537, 546 (Okl.Cr. 1994), cert. denied, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996); Black v. State, 871 P.2d 35, 43 (Okl.Cr.1994).
¶ 7 In the present case, we need not determine whether Appellant made a prima facie showing of intentional discrimination as the issue is moot. "Once a prosecutor has offered a race neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866, 114 L.Ed.2d at 405.
¶ 8 A review of the record in this case shows the prosecutor offered race-neutral explanations for striking Mrs. Peel and Mrs. Calamease from the panel.
A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.
Id. See also Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 1770-1771, 131 L.Ed.2d 834 (1995).
¶ 9 Over Appellant's objection, the State used its fourth peremptory challenge to excuse Mrs. Peel. The prosecutor explained that he excused her based upon her statements during voir dire that she had started a new job, she was not being paid for the time away from her job while sitting on the jury, she needed her salary to pay bills and the cause of the financial stress in not receiving her salary would be "weighing on her mind." On its face, this explanation does not reveal an intent to discriminate against the potential juror on account of race. The State's impression that the juror would not be able to give the case her full attention and put aside any personal concerns is a legitimate, race-neutral reason to strike a juror.
¶ 10 The State's sixth peremptory challenge was used to excuse Mrs. Calamease. Once again, the defense objected. The prosecutor explained that Mrs. Calamease *965 was not a registered voter, that she stated she had friends in "DOC" (Department of Corrections) and that "[s]ince she resides here in Tulsa County, we can only infer that those are prosecuted as a result of this officer's actions and I have serious concerns." (Tr. 343). The prosecutor also stated that Mrs. Calamease had indicated she had not had any contact with local law enforcement or the District Attorney's office outside of a sister who works in the records department. However, when the District Attorney's office ran a records check on her, they found she had been the victim of an assault with a firearm, the suspect in an assault and battery case, and several other instances where she had been either the victim or the suspect, and where, in certain cases, an alias had been used. The potential juror was also a victim in a case where the preliminary hearing was pending at the time. The prosecutor stated he felt Mrs. Calamease had been less than candid with the court and therefore, the State wished to excuse her from the panel. The trial court rejected the State's first two reasons for excusal, but permitted the State to exercise its peremptory challenge on the basis that the juror had not been candid with the court and that some of the information obtained by the District Attorney could have been brought out by the juror. The trial court found this to be a race-neutral basis for the challenge and stated that no purposeful discriminatory intent was evident from the prosecutor's explanation.
¶ 11 We agree the prosecutor's belief that Mrs. Calamease was not candid with the trial court was a sufficient race-neutral explanation. Mrs. Calamease's lack of candor on the issue of her contacts with law enforcement raised questions as to whether she was honest and candid in her answers regarding her ability to be a fair and impartial juror. The lack of candor and honesty on the part of a potential juror is not a characteristic that is peculiar to any race. Appellant asserts in a footnote that it "is not clear from the record, but it appears" that Mrs. Calamease was the only potential juror for whom the State ran a records check. Such assertion is not supported by the record, and contrary to Appellant's claim, does not support his argument that the State was searching for a pretextual, rather than genuine, reason to remove the juror.
¶ 12 Once the prosecutor offers a race-neutral basis for the exercise of the peremptory challenge, it is the duty of the trial court to determine if the defendant has established purposeful discrimination. "[I]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.... [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within a trial judge's province.'" Hernandez, 500 U.S. at 365, 111 S.Ct. at 1859, 114 L.Ed.2d at 409. Here, the trial court chose to believe the prosecutor's race neutral explanations for striking the jurors in question, rejecting Appellant's assertion that the reasons were pretextual. The trial court's decision on the issue of discriminatory intent will not be overturned unless we are convinced that the determination is clearly erroneous. Hernandez, 500 U.S. at 369, 111 S.Ct. at 1871-2, 114 L.Ed.2d at 412. See also Simpson v. State, 827 P.2d 171, 175 (Okl.Cr.1992). Apart from the prosecutor's demeanor, which we are not able to adequately review from the written transcripts, the court could have relied on the facts that the prosecutor defended his use of the peremptory challenges without being asked to do so by the judge, that the prosecutor did not challenge the seating of every black juror on the panel, that he had no history before the court of seeking to purposefully discriminate against jurors on the basis of race, and that the record in this case reveals that race was simply not an issue. No allegations were made that the commission of the offense or the prosecution of Appellant were in any way racially motivated. Therefore, we find no error in the trial court's determination that the prosecutor did not discriminate on the basis of race and that Appellant failed to carry his burden of showing purposeful discrimination. This assignment of error is denied.

*966 B.
¶ 13 In his second assignment of error, Appellant asserts the trial court discriminated against a potential juror on the basis of religion contrary to the federal and state constitutions, and that such action deprived him of a fair and impartial jury drawn from a fair cross-section of the community. At the beginning of trial, the court advised the potential jurors that the trial would probably last into a second week. In response, Venireperson Dormont informed the court that she would not appear in court on the Monday of the second week because the day was Rosh Hashanah, a religious holiday. The trial court initially indicated it would remove her for cause, but after Appellant's objection, the trial court simply excused Mrs. Dormont from the jury panel. Now on appeal, Appellant asserts that as the trial court did not cite any statutory exemption disqualifying Mrs. Dormont, she was competent to sit on the jury, and to exclude her from service solely on the basis of her religion violated her constitutional rights to sit as a juror.
¶ 14 It is clear from the context in which Mrs. Dormont was excused that the reason she was excused was to accommodate her personal schedule and the court's schedule, and not to discriminate against her on the basis of her religion. Although the trial court did not enunciate the statutory authority for its decision, such authority can be found in 38 O.S.Supp.1994, § 28. This provision allows the trial court to excuse or discharge any juror "if jury service would result in substantial hardship to the prospective juror." Id. Although Appellant did object to the removal of Mrs. Dormont, he did not object to the removal of another juror, Mrs. Koch, who indicated she had surgery scheduled for the end of the second week. In fact, Appellant asked that Mrs. Koch be excused. The court's authority to excuse that juror, as well as Mrs. Dormont, stemmed from section 28.
¶ 15 Further, Appellant asserts the trial court could have withheld jury proceedings on the day Mrs. Dormont was unable to attend court, and merely scheduled motion hearings or something not involving the jury. Certainly, the court could do that, but if it altered its schedule to fit Mrs. Dormant's schedule, it would also have to alter its schedule to fit Mrs. Koch's schedule and any other potential juror who might have a conflict. That the court is not required to do. Such repeated continuances would not allow for the timely disposition and trial of cases.
¶ 16 Further, Appellant contends the trial court discriminated not only against a particular religion but among religions. He asserts that court would not have been held on Christmas or Easter and that the trial court's disparate treatment of those celebrating Rosh Hashanah involved the ignoring of one religion while recognizing another in violation of the First Amendment. We agree with the State's contention that Appellant's argument is specious. The reason courts of this State are not in session on Christmas or Easter is not to accommodate certain religions, but because such dates have been designated state holidays by the State Legislature. 25 O.S.1991, § 82.1. This is the same reason courts are not in session on Memorial Day, Independence Day, Labor Day, Thanksgiving, etc . . ., days not associated with particular religions. Rosh Hashanah has simply not been included in the list of state holidays by the Legislature.
¶ 17 Finally, Appellant asserts that although Mrs. Dormont was the only prospective juror to be excused because she could not attend court on Rosh Hashanah, it is fair to assume that every person of the Jewish faith wishing to observe Rosh Hashanah would be equally ineligible to serve on the jury. He argues that such exclusion of a cognizable class of persons from the venire would deprive him of a fair and impartial jury drawn from a fair cross-section of the community.
¶ 18 Initially, we refuse to engage in the same assumptions as does Appellant. Further, to establish a prima facie violation of the fair cross-section requirement, an appellant must show (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires is not fair and reasonable in relation to the number of such persons in the *967 community; (3) this underrepresentation is caused by systematic exclusion of that group in the jury selection process. Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). See also Mitchell v. State, 884 P.2d 1186, 1195-96 (Okl.Cr.1994); cert. denied, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995). Appellant has not made such a showing in this case. Accordingly, we find the trial court's exclusion of Mrs. Dormont from the jury panel did not render Appellant's jury unconstitutionally partial. Therefore, this assignment of error is denied.

FIRST STAGE TRIAL ISSUES

JURY INSTRUCTIONS

A.
¶ 19 In his third assignment of error, Appellant asserts the jury was not properly instructed on the intent element of malice aforethought murder. Instruction No. 20 informed the jury in part:
"Malice aforethought" means a deliberate intention to take away the life of a human being or any other person.
(O.R.465). This instruction deviated from Oklahoma Uniform Jury Instructions-Criminal (OUJI-Cr) No. 428 (1st ed.) by substituting the phrase "or any other person" for "some other person." Appellant argues this instruction provided an incorrect application of the law of transferred intent and resulted in negating the effect of the second degree murder instructions. He asserts he has a constitutional right to have the jury consider and weigh the evidence under proper instructions, therefore, his convictions and sentences should be reversed. Appellant's objection at trial to the instruction has preserved the issue for appellate review.
¶ 20 We review this issue only as it pertains to Counts II (Martise Richardson) and III (Tina Pennington) as those were the only counts in which second degree murder instructions were given and the only counts in which the State argued the doctrine of transferred intent applied. Having reviewed Appellant's argument and the record, we find it is not necessary to address whether Instruction 20 properly stated the law of transferred intent as the evidence does not support the application of that law.
¶ 21 The evidence showed Appellant had the specific intent to kill both Martise and Tina. Appellant said he intended to kill Martise because Martise knew of his mother's plans, and the evidence showed Martise suffered from a contact wound. This indicates premeditation. At one point Appellant stated he did not intend to kill Tina; however, in a statement made to police shortly after the murders he stated he pointed the gun at her head and fired. Appellant admitted to being a good shot. Experts testified her wound was not consistent with that of a ricochet type injury. This evidence shows Appellant intentionally fired the gun once at Martise and then again at Tina. This is simply not a case where the doctrine of transferred intent applies. Any error in instructing the jury on the law of transferred intent was harmless as the evidence supported the findings of first degree malice aforethought murder. Therefore, Appellant has failed to show any prejudice. Accordingly, this assignment of error is denied.

B.
¶ 22 In his fourth assignment of error, Appellant challenges the jury instructions on second degree murder arguing they were misleading and did not accurately state the law. Specifically, he contends the addition of the word "not" in Instruction No. 23 resulted in an incorrect statement of the law and the language of Instruction No. 24 was confusing in that it gave both alternative definitions of depraved mind conduct.
¶ 23 The jury was given three (3) instructions on second degree murder. The first, Instruction No. 22, was verbatim OUJI-Cr 499, setting out the elements of the offense of second degree murder. (O.R. 467). The second instruction, No. 23, read as follows:
A person may not be convicted of Murder in the Second Degree if he/she engages in conduct imminently dangerous to another person that shows a depraved mind in extreme disregard of human life, although the conduct is not done with the *968 intention of taking the life of or harming any particular individual.
(O.R. 468). This instruction tracked the language of OUJI-Cr 450 verbatim except for the addition of the word "not" in the first sentence. The addition of that term, according to Appellant, resulted in an incorrect statement of the law. We review any error in this instruction for plain error only as no defense objection was raised to the instruction. Simpson v. State, 876 P.2d 690, 695 (Okl.Cr.1994). The addition of the term "not" in this instruction was error and did change the meaning of the instruction. However, this type of scrivener's error is subject to a harmless error analysis, which we will discuss shortly.
¶ 24 The third instruction on second degree murder given to the jury, Instruction No. 24, was verbatim OUJI-Cr 451 which defined "depraved mind." Appellant asserts this instruction was confusing as it set forth both alternative definitions of depraved mind conduct. Once again, we review only for plain error a no defense objection was raised at trial to this instruction. Id.
¶ 25 In Palmer v. State, 871 P.2d 429, 432 (Okl.Cr.1994), overruled in part by Willingham v. State, 947 P.2d 1074, 1080-81 (Okl.Cr.1997) this Court set forth jury instructions on second degree murder which should be used in place of OUJI-Cr 449, 450 and 451. In Palmer, depraved mind conduct is defined as "when he engages in imminently dangerous conduct with contemptuous and reckless disregard of, and in total indifference to, the life and safety of another." 871 P.2d at 432. Although Palmer has since been overruled, it was the law in effect at the time of Appellant's trial, therefore the instructions set forth in that case should have been given here.[2] Any error in failing to give these instructions is subject to a harmless error analysis.
¶ 26 In this case, the jury was instructed to consider the second degree murder instructions only if it found a reasonable doubt as to the defendant's guilt of first degree murder. See Instruction No. 22 (O.R. 467). It is well established that juries are presumed to follow their instructions. Zafiro v. U.S., 506 U.S. 534, 540, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993); U.S. v. Carter, 973 F.2d 1509, 1513 (10th.Cir.1992), cert. denied, 507 U.S. 922, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993); Jones v. State, 764 P.2d 914, 917 (Okl.Cr.1988). As the jury found Appellant guilty of first degree murder in all counts, they did not need to consider the charge of second degree murder and the accompanying instructions. Therefore, any error in those second degree murder instructions was harmless as it did not have a substantial influence on the outcome of the trial. Simpson, 876 P.2d at 702. Accordingly, this assignment of error is denied.

C.
¶ 27 In his fifth assignment of error, Appellant challenges the trial court's failure to give his requested instructions on intoxication and the lesser included offenses of second degree murder and first degree manslaughter.
¶ 28 Voluntary intoxication is not a defense to criminal culpability. 21 O.S.1991, § 153. However, we recognize an exception to this rule where the accused was so intoxicated that his mental abilities were totally overcome and it therefore became impossible for him to form the requisite criminal intent. Crawford v. State, 840 P.2d 627, 638 (Okl.Cr.1992). "If voluntary intoxication is to be relied upon as an affirmative defense, the defendant must introduce sufficient evidence to raise a reasonable doubt as to his ability to form the requisite criminal intent." Id. Had Appellant met this burden, the trial court would have been required to administer the voluntary intoxication instruction. Valdez v. State, 900 P.2d 363, 379 (Okl.Cr.), cert. denied, 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995).
¶ 29 In the present case, the record does not support the giving of an instruction on voluntary intoxication as there was no *969 evidence that Appellant was so intoxicated that he was unable to form the necessary intent to kill. The officer who first responded to the scene, Officer Walton, testified that Appellant told him he had just shot his wife and kids. He said that he had been having problems with his wife and, as a result, had moved out of the house approximately three (3) months prior and had been living with his sister. Appellant stated he believed his wife was having an affair and that his sister knew about it. When he confronted his sister with his beliefs, she laughed in his face and called him a "punk." In response, Appellant shot her once in the head. He then went to Anita Richardson's home, intending to kill her. He knocked on her door and when she answered an argument ensued. Appellant followed her to the back bedroom and shot her in the head. Appellant said he also shot Martise because he knew of Anita's plan and helped in that plan. He said he shot Tina by accident. Appellant then called 911 and informed the operator he shot his wife and kids. Officer Walton testified Appellant acted "extremely calm" in relating these events and did so on his own accord, without being questioned by the officer. Walton testified Appellant had no problem articulating what he had done. Another officer at the scene characterized Appellant's manner as "matter of fact." The evening before the murders, Appellant phoned his ex-wife asking for a gun and stated "things [are] coming to a head" with Anita. Appellant obtained the gun the next morning.
¶ 30 Evidence was introduced showing that Appellant had a history of problems with alcohol and that on the day of the murders he had consumed alcohol and prescription medicine. However, this evidence did not raise a reasonable doubt as to his ability to form the requisite criminal intent. It is not enough that an appellant show he had been drinking or ingesting drugs before or at the time of the murder. The appellant must show that the effects of the alcohol or drugs were such that he was rendered totally incapable of forming the requisite intent to commit murder. Crawford, 840 P.2d at 638. Appellant has failed to make such a showing in this case.
¶ 31 We find that Appellant's detailed description of the murders and the surrounding circumstances demonstrates that he was in control of his mental faculties and was not in the advanced state of intoxication he attempts to assert. His ability to recount these details undermines his claim on appeal that he was so intoxicated at the time of the murder that he could not have formed the intent to kill. See Valdez, 900 P.2d at 379. Accordingly, the trial court, in a proper exercise of its judicial duty, found insufficient evidence to warrant an instruction on the defense of intoxication.
¶ 32 Appellant also challenges the trial court's failure to give his requested instructions on second degree murder for Counts I (Anita Richardson) and IV (Avon Stevenson) and first degree manslaughter as to all counts. The trial court gave first degree murder instructions as to all four (4) counts, but added second degree murder instructions only as to Counts II (Martise Richardson) and III (Tina Pennington). First degree manslaughter instructions were not given at all. The trial court did not err in omitting instructions on second degree murder as second degree depraved mind murder is not a lesser included offense of first degree malice murder. Willingham v. State, 947 P.2d at 1081.
¶ 33 Further, instructions on first degree manslaughter were not warranted. Jury instructions on lesser included offenses need only be given when there is evidence in the record to support such instructions. Bryson v. State, 876 P.2d 240, 255 (Okl.Cr.1994), cert. denied, 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995). "It is within the trial court's discretion and responsibility to consider the evidence to determine if such instructions are warranted. This Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law." Id. (citations omitted).
¶ 34 In this case, no objection was raised at trial by the defense to the lack of an instruction on this offense, therefore we review only for plain error. To be entitled to an instruction on first degree manslaughter *970 under 21 O.S.1991, § 711(2), evidence must be presented to support the conclusion that the homicide was perpetrated without a design to effect death by means of a dangerous weapon. Boyd v. State, 839 P.2d 1363,1367 (Okl.Cr.1992), cert. denied, 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993).
¶ 35 Here there is no evidence the murders were committed without a "design to effect death." The circumstances surrounding the deaths of Anita Richardson and Avon Stevenson have already been discussed. As for the circumstances surrounding the death of Martise Richardson, Appellant stated he intended to kill the victim because he knew of his mother's "plan" regarding the alleged affair and the taking of the money. The evidence indicated Martise was next to his mother when shot, and the barrel of the gun had been placed next to his head. As for Tina Pennington, even though Appellant stated at one point that he did not intend to kill her, in a statement made to police shortly after the murders he stated he pointed the gun at her head and fired. Appellant also admitted to being a good shot. Experts testified her wound was not consistent with that of a ricochet type injury. After reviewing the evidence, we do not believe that a rational juror could find that the deaths were not the result of a premeditated design to effect death. See Conover v. State, 933 P.2d 904, 917 (Okl.Cr.1997). Accordingly, we find no abuse of discretion in the trial court's failure to instruct the jury on First Degree Manslaughter.
¶ 36 Appellant also claims that by failing to instruct the jury on these lesser included offenses, the trial court failed to provide the jury with the option of convicting him of a non-capital offense as required by Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) and Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Neither Beck nor Schad require that a jury in a capital case be given a third, non-capital option where the evidence absolutely does not support that option. The evidence in this case did not support instructions on first degree manslaughter as to all counts and the jury was thus properly precluded from considering that particular non-capital option. See Valdez, 900 P.2d at 378.

INEFFECTIVE ASSISTANCE OF COUNSEL
¶ 37 In his sixth assignment of error, Appellant contends he was denied the effective assistance of counsel by trial counsel's failure to introduce mental health experts to testify in the first stage of trial. Appellant asserts that counsel's failure to produce such witnesses, after his claims in opening statement that such witnesses would testify, left the jury with the inference that such witnesses were refusing to testify and as such cast doubt on his own testimony regarding his mental state.
¶ 38 This analysis of the ineffective assistance of counsel claim begins with the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Strickland sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. Unless the defendant makes both showings, "it cannot be said that the conviction .... resulted from a breakdown in the adversary process that renders the result unreliable." Id. 466 U.S. at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. Id. 466 U.S. at 688-89, 104 S.Ct. at 2065-66.
¶ 39 When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. Id. 466 U.S. at 696, 104 S.Ct. at 2070. Concerning the prejudice prong, the Supreme Court, in interpreting Strickland, has held:

*971 [an appellant] alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S., at 687, 104 S.Ct., at 2064; see also Kimmelman v. Morrison, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); Nix v. Whiteside, 475 U.S. [157], at 175, 106 S.Ct. [988], at 998[, 89 L.Ed.2d 123 (1986)]. Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him. See [United States v.] Cronic, 466 U.S. [648], at 658, 104 S.Ct. [2039], at 2046[ 80 L.Ed.2d 657 (1984)].
Lockhart v. Fretwell, 506 U.S. 364, 369-70, 113 S.Ct. 838, 842-43, 122 L.Ed.2d 180, 189 (1993) (footnote omitted). Although we must consider the totality of the evidence which was before the factfinder, our "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 695, 104 S.Ct. at 2069; Fisher v. State, 736 P.2d 1003, 1012 (Okl.Cr.1987).
¶ 40 In the present case, a psychiatrist and a psychologist evaluated Appellant prior to trial. Both reached a number of conclusions concerning his mental state. However, neither indicated Appellant was mentally ill at the time of the murders. During his first stage opening statement, defense counsel stated that these two professionals had examined Appellant and would differentiate between "what we normally think of depression" and clinical depression. Appellant called four (4) witnesses during the first stage; however, neither mental health professional was called. The record indicates counsel looked for a fifth witness, and upon not seeing the witness, requested a lunch break which the court granted. After checking with his investigator, defense counsel rested. Both mental health experts were called to testify in the second stage.
¶ 41 Based upon this record, counsel's decision not to call the mental health professionals during first stage appears to have been a strategic decision. After hearing all of the State's evidence, counsel seemed to focus the defense on intoxication and not insanity. Focusing and narrowing the defense based upon the State's evidence is a valid strategy. This Court has declined to second guess trial strategy on appeal. Smith v. State, 650 P.2d 904, 908 (Okl.Cr.1982). That the strategy proved unsuccessful is not grounds for branding counsel ineffective. Absent a showing of incompetence, the appellant is bound by the decisions of his counsel and mistakes in tactic and trial strategy do not provide grounds for subsequent attack. Davis v. State, 759 P.2d 1033, 1036 (Okl.Cr. 1988).
¶ 42 Further, the record does not support a claim that counsel's decision rendered the trial fundamentally unfair or the verdict unreliable. Evidence of premeditation and that Appellant was in control of his mental faculties at the time of the murders was substantial. Testimony of Appellant's depressed state was presented by Appellant himself, by his sister and through a physician's assistant at the Veteran's Administration Hospital who had seen Appellant the day of the murders and prescribed anti-depressant medication. The absence of the mental health professionals did not deny Appellant the ability to present his defense.
¶ 43 To support his argument that his trial was rendered fundamentally unfair by the omission of these witnesses in light of counsel's opening statement, Appellant relies on cases from other jurisdictions. Reviewing those cases and comparing them to the present case, this case is not one where witnesses were omitted in light of a promise made by defense counsel during opening statement and extensive comment was made about the same witnesses during closing argument. See Anderson v. Butler, 858 F.2d 16, 17 (1st Cir.1988). Nor is this case like *972 State v. Moorman, 320 N.C. 387, 358 S.E.2d 502, 507 (N.C.1987), where defense counsel made reference in opening statement to a critical piece of evidence which would show that the appellant could not have physically committed the crime when no such evidence existed, or In re Cordero, 46 Cal.3d 161, 249 Cal.Rptr. 342, 756 P.2d 1370, 1382 (Cal. 1988), where counsel failed to produce any evidence in support of the defendant's defense. Here, counsel merely commented that two witnesses would testify and they were not subsequently produced. The jury was instructed to base its verdict on the evidence presented to it, and not arguments by counsel. The absence of the two mental health professionals did not render the trial fundamentally unfair. Accordingly, we find Appellant was not denied the effective assistance of counsel and this assignment of error is denied.

PROSECUTORIAL MISCONDUCT
¶ 44 Appellant alleges in his seventh assignment of error that he was denied a fair trial by prosecutorial misconduct. Appellant lists ten instances of prosecutorial misconduct, in both first and second stages of trial, which we address as raised.
¶ 45 Initially, he asserts the prosecutor misstated the law by telling the jury in first stage closing argument "[y]ou are not told in these instructions that he has a defense of intoxication. You cannot give it to him under the law. It in no way mitigates what he did." (Tr. 936). We review only for plain error as no contemporaneous objection was raised at trial.
¶ 46 Based upon the evidence in this case, this comment was not an incorrect statement of the law. Insufficient evidence of intoxication was presented to warrant an instruction on the issue or the jury's consideration as a legal defense.
¶ 47 Appellant next asserts the prosecution failed to give proper notice of second stage witnesses Steven Brewster, a former EMSA paramedic, and Gina Kepler, Tulsa Police Department. These two witnesses responded to the scene at Anita Richardson's home and testified to the physical condition of Martise Richardson to support the aggravating circumstance of "especially heinous, atrocious or cruel." Appellant asserts these were surprise witnesses who were not listed in the State's Notice of Evidence and Summary Witnesses for Second Stage or its supplemental notice. Appellant argues the error here was not in failing to provide notice of second stage evidence and a list of witnesses, but in calling witnesses who were not named in the notice.
¶ 48 Title 21 O.S.1991, § 701.10, provides that "[o]nly such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible" during second stage proceedings. We have held that section 701.10, along with Okla. Const. art. II, § 20, requires the State to provide a capital defendant with "a summary of the evidence intended to support the alleged aggravating circumstances, and a list of witnesses the State might call" and not a detailed description of anticipated second stage evidence. Walker v. State, 887 P.2d 301, 316-317 (Okl.Cr.1994). See also Wilson v. State, 756 P.2d 1240, 1245 (Okl.Cr.1988).
The purpose of this pretrial notice requirement is "to allow the defendant time to present a defense or an explanation for alleged criminal misconduct." Stated in more general terms, its purpose is "to apprise the defendant of evidence relevant to sentencing which will be introduced for the first time in the sentencing hearing." "[F]ailure to object to lack of notice, either at a pre-trial hearing or at the time the challenged evidence is offered, will result in waiver of this statutory right."
Walker, 887 P.2d at 316-317 (footnotes omitted).
¶ 49 Initially, Appellant raised no objection to Officer Kepler's testimony. His objection to Brewster was different than that now made on appeal. At trial, Appellant did not object to Brewster's testifying as he was called to the stand but waited until the prosecution was well into direct examination of the witness. Appellant's objection then was not that the prosecution had called a witness not previously listed, but that the defense did not have a copy of the report from which the witness was testifying. Appellant's failure to *973 object on the grounds that Brewster was not listed as a witness, and his failure to offer any objection to Officer Kepler waives all but plain error review of the issue.
¶ 50 During a bench conference, defense counsel admitted that Brewster had been endorsed as a witness, but the defense had no idea of the subject of his testimony. The trial court ruled that the witness could testify but that he could use not his report. The record shows that Brewster was endorsed on the felony information as an EMSA attendant. In the State's Notice of Evidence and Summary of Witnesses for Second Stage, the State stated in part that all first stage evidence would be adopted and incorporated by reference for purposes of all three aggravating circumstances and:
The State will offer and reoffer evidence of the physical condition of [the victims], including but not limited to time of injury, time of death, conscious state, type of injury, result of injuries, and conscious pain and suffering through testimony of attending physicians, detectives and officers at the scenes...... These witnesses will include...... V. Munurzuri, ... with all addresses previously listed on the Information... This evidence will be offered in support of the aggravating circumstances of . . . . and (2) heinous, atrocious and cruel.
(O.R. 181).
¶ 51 Subsequently, the State filed a Notice of Witnesses in Death Penalty Jury Trial. (O.R. 246-247). "S. Brewster" was listed and his affiliation with EMSA was noted. Gina Kepler, Tulsa Police Department, was also listed.
¶ 52 Although neither Kepler nor Brewster is specifically listed in the State's Notice of Evidence and Summary of Witnesses for Second Stage, any error in calling them to testify is harmless as Appellant had sufficient notice of the State's second stage evidence. The State's listing of all officers at the scene included Officer Kepler, as she was specifically endorsed on the felony information. The listing of V. Munurzuri, an EMSA attendant at the murder scene, and the listing of S. Brewster on the Information and Notice of Witnesses In Death Penalty Jury Trial was sufficient to put Appellant on notice that any other emergency medical personnel on the scene could be called to testify as to the physical conditions of the victims. Defense counsel cannot reasonably argue he was surprised by Brewster's testimony. Contrary to Appellant's argument, this is not a case of trial by ambush. See e.g. Jones v. State, 917 P.2d 976 (Okl.Cr.1995). Here, Appellant was provided sufficient notice of the nature of the evidence the State would rely upon to prove the aggravator of "heinous, atrocious, or cruel." Therefore, we find neither reversal nor modification is warranted on this ground.
¶ 53 Appellant next argues the prosecution improperly introduced crime scene photographs which did not accurately reflect the scene at the time of the crime, and knowing that the scene had been altered at the time of the photos. Specifically, Appellant complains about State's Exhibits 2, 3, and 9. Initially, Appellant's objection to State's Exhibit 3 was sustained and the photo was not admitted into evidence. Therefore, Appellant's argument is moot. State's Exhibits 2 and 9 were admitted without any objection by the defense, therefore we review only for plain error.
¶ 54 We find the prosecution did not attempt to mislead the jury or create an erroneous impression by the introduction of the photos. All of the witnesses who testified to the photos stated that the photos accurately depicted the scene as they saw it, which was after emergency medical personnel had arrived and evaluated the victims. At no time were the photos described as depicting the scene at the time of the murders and before the arrival of medical personnel. Any inconsistencies on the issue could have been cleared up by defense counsel on cross-examination of the witnesses. The prosecution did refer to the photos in closing argument. However, all comments were properly based on Appellant's description of the scene at the time of the murders or the scene as observed after the arrival of medical personnel. We find no prosecutorial misconduct in the introduction of these photos.
*974 ¶ 55 Appellant further argues the prosecutor conducted a bad-faith examination of defense witness, Dr. Reynolds. During second stage, the prosecutor examined Dr. Reynolds, in part, about Appellant's military record. At one point, the prosecutor asked if the witness was aware, by looking at Appellant's military records, whether Appellant was dishonorably discharged. Defense counsel objected, the trial court sustained the objection, and admonished the jury to disregard the question.
¶ 56 This Court has repeatedly found that an admonition by the court to the jury to disregard certain information usually cures any error unless it appears to have determined the verdict. Roberts v. State, 868 P.2d 712, 718 (Okl.Cr.1994); Womble v. State, 663 P.2d 747, 749 (Okl.Cr.1983). In light of the evidence supporting the aggravating circumstances, the prosecutor's inquiry could not have determined the verdict.
¶ 57 Additionally, Appellant asserts that the prosecution argued facts not in evidence by asserting in the first stage closing argument that Avon Stevenson was fleeing her apartment when Appellant chased her down and shot her. No contemporaneous objection was raised to this comment, therefore we review only for plain error.
¶ 58 Reading the comment in context, the prosecutor was merely stating that more than one inference could be gathered from the evidence. He stated that in addition to Appellant's version of events  that Avon followed him out of the apartment, argued with him and he shot her  it could also be inferred that Avon was running away from her brother, aware of his anger and possession of a gun. Counsel for both the State and the defense have a right to discuss fully from their standpoint the evidence, and the inferences and deductions. Carol v. State, 756 P.2d 614, 617 (Okl.Cr.1988).
¶ 59 Appellant next argues the prosecution improperly played upon the jury's sympathy for the victims during the first stage closing argument. No defense objection was raised to the challenged comments; therefore, we review only for plain error. Having reviewed the comments, we find they would not have caused the jury to decide the case based solely on emotion. Appellant also asserts the prosecution repeatedly referred to Tina Pennington's medical problems as the basis for a finding of guilt as to first degree murder. The record shows that in addition to referring to her medical problems, the prosecution also argued the circumstances under which she was killed supported a finding that Appellant was guilty of intentionally killing Tina Pennington. As the prosecution's argument was based on the evidence, and did not emphasize a certain portion over another, we find no error.
¶ 60 Appellant also asserts the prosecutor improperly demeaned him by calling him a "cold-blooded murderer," "cold-blooded killer," by asking the jury what they would call someone "who took a gun to four victims' heads" and by referring to the "excuses and the fooling and the malingering and the dramatics of a murder defendant." The first and third comments were not met with contemporaneous objections. The objection to the second comment was sustained and the objection to the fourth comment overruled.
¶ 61 A review of these comments shows Appellant was not denied a fair trial by any improper comments. Contrary to Appellant's claim, he was not called a "cold-blooded murderer" but the murders were described as being committed "cold-bloodedly." This comment was based upon the State's view of the evidence and was not a personal attack on Appellant. Likewise, the fourth comment referring to a "murdering defendant" is based upon the State's view of the evidence and not mere name calling.
¶ 62 Appellant's objection to being called a "cold-blooded killer" was sustained. Reversal of a conviction is not required where a defense objection is sustained. See Shepard v. State, 756 P.2d 597 (Okl.Cr.1988). The reference to Appellant taking a gun to the victims' heads in the third challenged comment is properly based on the evidence.
¶ 63 Appellant also contends the prosecutor called him a liar. The prosecutor stated:

*975 Mark Twain once said first get your facts straight and then you can lie about them as much as possible. He can't even tell the truth on that ladies and gentlemen.
Reading this comment in context, the prosecutor was quoting Mark Twain and then indicating that Appellant had not told the truth. The prosecutor may comment on the veracity of the testimony when it is supported by the evidence. Robertson v. State, 521 P.2d 1401, 1402 (Okl.Cr.1974). Here, there were inconsistencies between Appellant's pre-trial statements and his trial testimony, therefore the State could properly comment on his veracity.
¶ 64 Appellant finally asserts the combined effect of the prosecutorial misconduct denied him a fair trial and undermined the reliability of the death sentence. Having reviewed all of the challenged comments, we find that some comments certainly tested the bounds of proper argument. However, we cannot say that the cumulative effect of any errors was so prejudicial as to affect the fundamental fairness and impartiality of the proceedings. See Dunagan v. State, 734 P.2d 291, 293 (Okl.Cr.1987). Accordingly, as the prosecutor's conduct did not deny Appellant a fair trial or in any way determine Appellant's guilt or punishment, this assignment of error is denied.

SECOND STAGE ISSUES

A.
¶ 65 In his eighth assignment of error, Appellant contends the jury was improperly instructed regarding the aggravating circumstance "especially heinous, atrocious or cruel." The jury was instructed that the phrase "especially heinous, atrocious or cruel" is directed to those crimes where the death of the victim is preceded by torture of the victim or serious abuse rather than serious physical abuse as set out in the uniform jury instruction. See OUJI-Cr 436 (1st ed.) (emphasis added). Appellant contends this instruction lessened the standard of proof required by the State. He also asserts such misinstruction was critical as the evidence of torture was insufficient to support the aggravator.
¶ 66 At trial, Appellant objected generally to the inclusion of an instruction on this aggravator. No specific objection was made as to the language used in the instruction. Therefore, Appellant's failure to object at trial on the grounds he now raises on appeal waives all but plain error review. See Tyler v. State, 777 P.2d 1352, 1355 (Okl.Cr.1989).
¶ 67 This deviation from the uniform instruction is error. Johnson v. State, 928 P.2d 309, 318 (Okl.Cr.1996). However, we are not persuaded that the error lessened the standard of proof which the jury had to apply to find this aggravator. Id.; See also Richie v. State, 908 P.2d 268, 278 (Okl.Cr.1995). The term "serious abuse" controls the standard of proof, and that term was given to the jury. Johnson, 928 P.2d at 318. Further, the specific facts of the instant case placed the jury's focus on the "conscious torture" element of the especially heinous, atrocious or cruel aggravator and not the abuse element. Richie, 908 P.2d at 278. Therefore, we find the error harmless as it did not lessen the standard of proof and thus could have had no impact on the sentencing decision. Simpson, 876 P.2d at 698-99.[3]

B.
¶ 68 Appellant challenges the sufficiency of the evidence supporting the "especially heinous atrocious or cruel" aggravator in his next assignment of error. Specifically, he asserts that as Anita Richardson and her children all died from a single gunshot wound to the head, there was no evidence of prolonged conscious physical suffering of the victims prior to their deaths.
¶ 69 When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence *976 to support the State's charge that the aggravating circumstance existed. In making this determination, this Court should view the evidence in the light most favorable to the State. Bryson, 876 P.2d at 259; Romano v. State, 847 P.2d 368, 387 (Okl.Cr.1993), aff'd, Romano v. Oklahoma, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). Evidence supporting a finding that a murder was especially heinous, atrocious or cruel requires proof that the death was preceded by torture or serious physical abuse. Neill v. State, 896 P.2d 537, 555 (Okl.Cr.1994); cert. denied, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740, (1996).
¶ 70 In the present case, we are concerned with the torture aspect of this aggravator. In Berget v. State, 824 P.2d 364, 373 (Okl.Cr.1991), cert. denied, 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992) we stated that torture may include the infliction of either great physical anguish or extreme mental cruelty. This Court further stated:
When used to define a class of defendants against whom the death penalty is sought, torture creating extreme mental distress must be the result of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created. The length of time which the victim suffers mental anguish is irrelevant.
See also Neill, 896 P.2d at 555.
¶ 71 In Cheney v. State, 909 P.2d 74, 80 (Okl.Cr.1995), the Court said the "torture creating extreme mental distress must be the result of intentional acts by the defendant. The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing. Analysis must focus on the acts of the defendant toward the victim and the level of tension created." Id. The mental torture element is confined to cases in which the victim is terrorized for a significant period of time before death. Id. at 81.
¶ 72 Appellant's own statements provide the basis for a finding of this aggravator as it pertains to Count I (Anita Richardson). Appellant's statements indicate that he shot Anita first, then Martise and lastly Tina. Appellant stated an argument with Anita ensued at the front door, they worked their way to the rear bedroom, where they struggled and Appellant told her she and her children were going to die. He then shot her once in the head. She was unconscious when paramedics arrived and died at the scene. While neighbors testified Appellant was not in the home longer than ten (10) minutes, we find Appellant's conduct and threats sufficient to cause in Anita the extreme mental anguish necessary to support the mental torture aspect of this aggravator.
¶ 73 As for Count II (Martise Richardson), Appellant said he shot Martise because he knew of his mother's affair. Appellant also said Martise came running into the room where he was struggling with Anita and began hitting Appellant. Martise was initially found by paramedics laying across his mother's lap. Viewing this evidence in the light most favorable to the State, Martise was near his mother when she was shot and it can be reasonably inferred that he feared he would be shot next. This evidence is sufficient to support the mental torture aspect of this aggravator.
¶ 74 Evidence was also introduced of conscious physical suffering experience by Martise. One of the first arriving paramedics testified Martise was alert, and reached up and grabbed the paramedic's arm when he tried to put the oxygen mask on him. When Martise was moved from the apartment for transportation to the hospital, he waved his arm and hit the spot where he had been shot. He was pronounced dead later at the hospital. The State tried very hard to prove Martise was conscious and in pain. However, the medical examiner testified that Martise was probably rendered unconscious at the scene. This inconsistent evidence is insufficient to support a finding of conscious physical suffering. Further, in light of the jury instruction given on this issue, discussed above, emphasizing mental torture over physical abuse, this evidence of conscious physical suffering is not sufficient to support the aggravator.
*977 ¶ 75 As to Count III (Tina Pennington), the evidence of extreme mental anguish is inconsistent. Immediately after the murders, Appellant said he did not mean to shoot her. However, in a later interview, he said he shot her point blank, and that he was a good shot. (Her wound was not a contact wound nor a ricochet type wound). He also said she was crying and screaming during the altercation with Anita and Martise. He said she was still conscious after being shot, that she followed him outside, but he told her to go back inside and wait with her mother for an ambulance. Tina was laying on the bed when paramedics arrived. She died later at the hospital. Having her mother killed in front of her, and possibly her brother and then waiting her turn, seems sufficient to warrant a finding of mental torture. However, Tina's stepfather testified in his victim impact statement that Tina was deaf and blind. This was the only mention made by either the State or the defense that Tina could not hear or see. If in fact she was deaf and blind, a question arises as to whether Tina was aware her mother and brother had been shot and whether she had any indication she was to be killed next. This uncertainty in the evidence causes us to find the evidence insufficient to support the mental torture element of the aggravator.
¶ 76 The State also presented evidence of conscious physical suffering; the paramedics testified that upon their arrival she was alive and breathing, and her teeth were clenched, a response to her painful head injury. However, the testimony also showed she was unconscious. She was transported to the hospital for further treatment. She died two days later never having regained consciousness. We find this evidence insufficient to support the conscious physical suffering aspect of the aggravator. Having found the aggravator not supported by either mental torture or conscious physical suffering, we find the "especially heinous, atrocious or cruel" aggravator falls as to Count III. The effect of this will be discussed in the Mandatory Sentence Review.

C.
¶ 77 In his tenth assignment of error, Appellant contends the evidence was insufficient to support the "continuing threat" aggravator. To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future. Hain v. State, 919 P.2d 1130, 1147 (Okl.Cr.1996). A finding that the defendant would commit criminal acts of violence that would constitute a continuing threat to society is appropriate when the evidence establishes 1) the defendant participated in other unrelated criminal acts; 2) the nature of the crime exhibited the calloused nature of the defendant; or 3) the defendant had previously been convicted of a crime involving violence. Battenfield v. State, 816 P.2d 555, 566 (Okl.Cr.1991); cert. denied, 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992). To prove this aggravating circumstance, this Court has held that "the State may present any relevant evidence, in conformance with the rules of evidence, . . . including evidence from the crime itself, evidence of other crimes, admissions by the defendant of unadjudicated offenses or any other relevant evidence." Id.
¶ 78 In the present case, the State presented no evidence of a prior criminal history. Therefore we look to the circumstances surrounding the murders of which Appellant was convicted. In determining the callousness of the crime, the defendant's attitude is critical to the determination of whether he poses a continuing threat to society. Hain, 919 P.2d at 1147. "A defendant who does not appreciate the gravity of taking another's life is more likely to do so again." Id. quoting Snow v. State, 876 P.2d 291, 298 (Okl.Cr.1994), cert. denied, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995).
¶ 79 Appellant's own words and actions show the callousness with which the murders in this case were committed. After shooting his sister, girlfriend and his two children, Appellant sat outside smiling and waited for the police to come. In subsequent interviews with police, he asked if the police could let the men Anita was supposedly having an affair with out of jail so he could kill *978 them. Appellant laughed when he talked about shooting one of the men. Appellant also talked of having a shoot-out with the police. He admitted to shooting his victims but showing no remorse, stating he could have left them and the police would not have found them for several days. This evidence of Appellant's attitude and actions showed he has a propensity to violence which makes him a continuing threat to society. Accordingly, this assignment of error is denied.

D.
¶ 80 Appellant next challenges the evidence supporting the "great risk of death" aggravator. However, he initially challenges this aggravator as it pertains to Count IV, the homicide of Avon Stevenson. The validity of the jury's finding of this aggravator as it pertains to Count IV is a moot issue as the jury returned a sentence of life imprisonment without the possibility of parole. A valid aggravator is not required for the imposition of a sentence of life without parole. This brings us to the second part of Appellant's argument and that is whether the finding of the aggravator as it pertained to Count IV undermined the reliability of the death sentences imposed for the other three murders as the jury improperly looked only to the number of deaths to support the aggravator. To the contrary, the jury's finding of this aggravator in Count IV shows a conscientious jury who looked at the facts of each homicide independently in determining punishment. Further, evidence of Appellant shooting and killing three people in the same home supports the jury's finding that in Counts I, II and III Appellant's knowingly created a great risk of death to more than one person. See Hain, 919 P.2d at 1147.

E.
¶ 81 Appellant next argues he was denied a fair sentencing proceeding when the same evidence was used in all three of the aggravators found in Counts I, II and III. Appellant asserts the overlapping of evidence stacked the aggravators before they were placed on the scales with the mitigating evidence, inflating the importance of each and skewing the weighing process.
¶ 82 This Court has upheld the use of the same act or course of conduct to support more than one aggravating circumstance where the evidence shows different aspects of the defendant's character or crime. Medlock v. State, 887 P.2d 1333, 1350 (Okl.Cr. 1994), cert. denied, 516 U.S. 918, 116 S.Ct. 310, 133 L.Ed.2d 213 (1995); Paxton v. State, 867 P.2d 1309, 1324-25 (Okl.Cr.1993), cert. denied, 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994); Pickens v. State, 850 P.2d 328 (Okl.Cr.1993), cert. denied 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994); Berget, 824 P.2d at 376; Smith v. State, 819 P.2d 270, 278 (Okl.Cr.1991); Green v. State, 713 P.2d 1032 (Okl.Cr.1985), cert. denied, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986), overruled in part on other grounds in Brewer v. State, 718 P.2d 354, 366 (Okl.Cr. 1986).
¶ 83 Here, the aggravators found by the jury do not cover the same aspect of Appellant's character or his crime. The "continuing threat" circumstance goes to the aspect of the need for protection of society from a defendant's probable future conduct. In this case, it is supported by the callousness with which Appellant committed the murders and his threats to kill in the future. The "great risk of death" aggravator is supported by Appellant's conduct of brandishing a firearm and killing three people, and the "especially heinous, atrocious or cruel" aggravator is supported by the extreme anguish and mental torture Appellant caused his victims to suffer prior to their deaths.
¶ 84 Relying on United States v. McCullah, 87 F.3d 1136 (10th Cir.1996), Appellant asserts the Tenth Circuit Court of Appeals has held the use of duplicative aggravating factors creates an unconstitutional skewing of the weighing process. In McCullah, the Court, on rehearing, held that submission of four particular aggravating circumstances to the jury, one of which was a non-statutory aggravator, was unconstitutional as all four of the aggravators addressed the same aspect of the defendant's mental state. See United States v. McCullah, 76 F.3d 1087, 1106-12 (10th Cir.1996). McCullah is distinguishable in that it highlights the difference in federal case law where both statutory and *979 non-statutory aggravators are utilized. This is very different from our state statutory scheme where eight distinct aggravators aimed at very different aspects of the defendant's character and conduct are set forth and these are the only aggravators which can be utilized in determining the appropriateness of a death sentence. As the evidence in the present case supporting the three statutory aggravators involved different aspects of Appellant's character or crime, we find no duplication or overlapping of aggravators. Accordingly, this assignment of error is denied.

F.
¶ 85 In his thirteenth assignment of error, Appellant asserts the mitigating evidence outweighed aggravating evidence, therefore the death sentences cannot stand. Appellant argues that "the only factually substantiated aggravator in this case was the nonstatutory `multiple deaths' aggravator" and when the evidence of multiple homicide is weighed against the mitigating evidence, it cannot be said the aggravation outweighed the mitigation.
¶ 86 In Fisher v. State, 736 P.2d 1003, 1010 (Okl.Cr.1987), the appellant similarly claimed that his death sentence must be set aside because the mitigating circumstances outweighed the aggravating circumstances.
[T]his Court will review such evidence only to the extent necessary to determine whether there was sufficient evidence from which a rational sentencer could find that the balance of aggravating and mitigating circumstances warranted a death sentence. We believe that this standard, which is analogous to the sufficiency of the evidence standard adopted by this Court in Spuehler v. State, 709 P.2d 202, 203-04 (Okl.Cr. 1985), comports with the requirements of due process and adequately ensures that the death penalty is evenly enforced.
Id. at 1011. Applying this standard to the instant case, we find that there was sufficient evidence from which a rational sentencer could find that the aggravating circumstances outweighed the mitigating circumstances. Thus, this assignment of error is without merit.

G.
¶ 87 In his sixteenth assignment of error, Appellant challenges the constitutionality of the three aggravators found in this case. He recognizes this Court has previously rejected his arguments but urges this Court to reconsider its position.
¶ 88 We have reviewed Appellant's argument and are not persuaded to change our position that the aggravating circumstances of "great risk of death" (See Valdez, 900 P.2d at 383), "continuing threat" (See Allen v. State, 923 P.2d 613, 622 (Okl.Cr.1996) judgment vacated and remanded to Oklahoma Court of Criminal Appeals, 956 P.2d 918 (1998)), and "especially heinous, atrocious or cruel" (See Cargle v. State, 909 P.2d 806, 830 (Okl.Cr.1995)) are constitutionally valid. Accordingly, this assignment of error is denied.

INEFFECTIVE ASSISTANCE OF COUNSEL
¶ 89 In his fourteenth assignment of error, Appellant contends he was denied effective assistance of counsel by counsel's concession during closing argument that Appellant was death eligible. During closing argument, counsel stated, in part, "I concede that maybe the aggravating circumstance of great risk of death to more than one person is here." Appellant likens this comment to conceding his guilt and contends counsel denied him the opportunity to have the jury consider the limitations that are placed on the aggravator. This, he argues, resulted in a complete breakdown of the adversary process.
¶ 90 In order to understand the meaning of the challenged comment, it must be read in context of the entire closing argument. Read in that context, it is clear that Appellant's counsel was not conceding guilt or imposition of the death penalty. The comment was a prelude to the argument that even if the jury found the existence of the aggravator, this only meant they were authorized to consider the death penalty. Defense counsel then proceeded to point out the evidence in mitigation, summarizing the testimony of each mitigation witness and arguing *980 zealously for a sentence other than death. Contrary to Appellant's contention, counsel's argument was not a concession that a finding of the great risk of death aggravator was a foregone conclusion nor did it make the jury's finding on the other aggravators superfluous.
¶ 91 Appellant has failed to overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. A finding that one aggravator existed, would not, in itself, have been sufficient to warrant a death sentence. The jury was told, by counsel and in their instructions, they must weigh any aggravators found supported by the evidence against the mitigating evidence. Defense counsel argued that in doing so, the jury would find the mitigating outweighed the aggravating and therefore the death penalty was not warranted. We cannot say the decision to make this argument was not a sound tactical choice on counsel's part.
¶ 92 We find that counsel exercised the skill, judgment and diligence of a competent defense attorney under the circumstances when he employed the strategy to arguably concede one aggravator and focus on the mitigating evidence and the weighing of such against the aggravators. Appellant has failed to show counsel's conduct rendered the sentencing proceeding unreliable or deprived him of a substantial or procedural right to which the law entitles him. See Lockhart v. Fretwell, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.2d 180, 191 (1993). Accordingly, this proposition is denied.

VICTIM IMPACT EVIDENCE
¶ 93 In his fifteenth assignment of error, Appellant asserts the death sentences must be vacated as the use of victim impact evidence violated his rights under the eighth and fourteenth amendments to the federal constitution. Appellant's argument is two-fold. First, he asserts the jury's consideration of the victims' family's characterizations and opinions about the circumstances surrounding the crime was improper and unconstitutional under Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) overruled in part, Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Secondly, he argues he was denied a reliable sentencing as the jury heard victim impact evidence before the State concluded its evidence in aggravation and as the jury received no instructions on the legal effect they were to give the victim impact evidence. Appellant's objection at trial has preserved this issue for appellate review.
¶ 94 This Court addressed victim impact evidence at some length in Cargle, 909 P.2d at 826-828. This Court said that pursuant to 22 O.S.Supp.1993, § 984 the evidence should be restricted to the "financial, emotional, psychological, and physical effects," or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim. Id. at 898. The Court explained that "[s]o long as these personal characteristics show how the loss of the victim will financially, emotionally, psychologically, or physically impact on those affected, it is relevant, as it gives the jury `a glimpse of the life' which a defendant `chose to extinguish'". Id. These personal characteristics should constitute a "quick" glimpse into the life taken and
its use should be limited to showing how the victim's death is affecting or might affect the victim's survivors, and why the victim should not have been killed. Mitigating evidence offers the factfinder a glimpse of why a defendant is unique and deserves to live; victim impact evidence should be restricted to those unique characteristics which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family.
Id.
Subsequently in Ledbetter v. State, 933 P.2d 880 (Okl.Cr.1997) this Court addressed characterizations and opinions about the crime, the defendant and the appropriate punishment. The Court said that based upon a review of Booth and Payne the ban against this type of victim impact evidence was overruled. 933 P.2d at 890-891.
*981 ¶ 95 Finding this type of victim impact evidence generally admissible does not end our analysis. Conover, 933 P.2d at 920. The evidence must not only be relevant, but it is subject to the balancing provisions of 12 O.S. 1991, § 2403. Id. See also Cargle, 909 P.2d at 826. "Although it does not violate the Eighth Amendment, evidence may be introduced `that is so unduly prejudicial that it renders the trial fundamentally unfair,' thus implicating the Due Process Clause of the Fourteenth Amendment." Conover, 933 P.2d at 920 (citations omitted). A balancing is required "to keep the scales of a capital trial from being unfairly weighted in favor of one side or the other." Id.
¶ 96 In the present case, the husband of Anita Richardson, Jerry Richardson, provided the only victim impact evidence.[4] Specifically, Appellant complains about Richardson's comment that Anita was shot in the back of the head, that Martise was protecting his mother, that Tina was shot and left for dead, and that the murders were brutal. The first three comments were properly admitted as characterizations of the crime. That the witness may have misstated the location of the wound suffered by Anita (the medical examiner testified the bullet entered above her left ear), was minor and not grounds for finding the evidence inadmissible. The last comment, describing the murders as brutal, does not fall within the specified evidence allowed under Section 984 and therefore was improperly admitted. See Ledbetter, 933 P.2d at 890. The impact of this error will be discussed inter alia.
¶ 97 Appellant also finds error in Richardson's call for justice to be done and for justice to prevail. He calls these comments thinly veiled recommendations of death. Appellant also points out a note at the bottom of the victim impact statement which read: "Jerry Richardson favors the death penalty as appropriate punishment."
¶ 98 In Ledbetter, we stated that while opinion evidence on the appropriate punishment is admissible, it will be viewed by this Court with a heightened degree of scrutiny as we apply the probative value-versus-prejudicial effect analysis. 933 P.2d at 891. We noted that any opinion as to the recommended punishment should be a short comment, without amplification. Id.
*982 ¶ 99 Here, Appellant has offered no support for his claim that the comment regarding "let justice be done" was a recommendation for the death penalty. Appellant has offered no proof that the jury understood the comment that way. However, even if they did, the comment was proper as an opinion or a recommended sentence under 22 O.S.Supp.1993, § 984. As for the notation at the bottom of the victim impact statement, it was not read to the jury, the written victim statement was not admitted into evidence and there is no proof that the jury ever saw the note. Therefore, aside from the single comment that the murders were brutal, we find no error in the admission of the victim impact evidence. Further, as that erroneous comment was a single, isolated remark, we find it was harmless beyond a reasonable doubt. Bartell v. State, 881 P.2d 92, 95 (Okl.Cr.1994).
¶ 100 Turning to the second part of Appellant's argument, in Cargle this Court prescribed a jury instruction on victim impact evidence to be used in all future cases. 909 P.2d at 828-829. The Court also stated in Cargle that victim impact evidence should not be admitted until the trial court determines evidence of one or more aggravating circumstances is already present in the record. Id. at 828. In this case, a jury instruction on victim impact evidence was not given nor had the trial court determined that evidence of an aggravator was present prior to the admission of the victim impact evidence. However, Appellant's case was tried prior to the Cargle decision and we have held that Cargle is not retroactive. Therefore, the trial court cannot be faulted for failing to comply with Cargle. See Conover, 933 P.2d at 922; Charm v. State, 924 P.2d 754, 766 (Okl.Cr.1996).
¶ 101 Looking to the instructions given to the jury, we find the jury was properly informed on the applicable law. The instructions informed the jury that before they could impose the death sentence, it must first find at least one aggravating circumstance beyond a reasonable doubt and that the evidence of aggravating circumstances must outweigh any mitigating circumstances. The admission of the victim impact evidence did not alter or negate these instructions. Appellant has failed to demonstrate that the jury's sentencing discretion was not properly channeled by the instructions given to them or that the victim impact evidence influenced the jury to impose a sentence not supported by the evidence. See Conover, 933 P.2d at 923. Therefore, we find no error in the court's failure to specifically instruct the jury on the use of the victim impact evidence.

SECOND STAGE JURY INSTRUCTIONS
¶ 102 In his seventeenth and final proposition of error, Appellant challenges the second stage jury instructions arguing 1) that the instructions implied that jury findings as to mitigators must be unanimous and that the jury should have been instructed such findings do not have to be unanimous and 2) the instructions on the mitigating evidence permitted the jurors to ignore that evidence altogether and seriously diminished the effect of the mitigating evidence presented in the case.
¶ 103 This Court has repeatedly rejected the argument that the trial court's failure to give a jury instruction stating that the jury's findings regarding mitigating circumstances does not have to be unanimous violates a defendant's rights to a fair sentencing proceeding. Charm v. State, 924 P.2d at 773; Hain v. State, 919 P.2d 1130, 1144 (Okl.Cr. 1996); LaFevers v. State, 897 P.2d 292, 309 (Okl.Cr.1995), cert. denied, 516 U.S. 1095, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996); Bryson v. State, 876 P.2d at 262. Appellant has not persuaded us to change that position. Further, none of the instructions given in this case instructed the jury that they must unanimously find the existence of mitigating circumstances before such circumstances may be considered.
¶ 104 We have also previously rejected Appellant's argument that instructing the jury that they "may consider" mitigating evidence created a doubt as to the jury's constitutional duty to consider such evidence. Charm, 924 P.2d at 773; Richie v. State, 908 P.2d 268, 279 (Okl.Cr.1995); Pickens v. State, 850 P.2d at 339-340. We reject such argument *983 again. Reviewing in their entirety the instructions given to the jury in this case concerning mitigating evidence, we find no error. Accordingly, this assignment of error is denied.

MANDATORY SENTENCE REVIEW
¶ 105 Pursuant to 21 O.S.1991, § 701.13(C), we must determine 1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and 2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. Turning to the second portion of this mandate, as to Counts I, II and III the jury found the existence of three (3) aggravating circumstances: 1) the defendant knowingly created a great risk of death to more than one person; 2) the murders were especially heinous, atrocious or cruel; and 3) the existence of a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(2)(4)(7). As discussed previously, we have found as to Counts I and II that each of the aggravators is supported by sufficient evidence. As to Count III, we found the aggravator of "especially heinous atrocious or cruel" not supported by the evidence. When this Court invalidates an aggravating circumstance, and at least one valid aggravator remains, this Court may reweigh the mitigating evidence against the valid aggravating circumstance or circumstances to determine whether the weight of the improper aggravator is harmless and the sentence of death valid. Valdez, 900 P.2d at 384. Consideration of the improper aggravator is harmless if the elimination of that aggravator does not affect the balance of mitigating and aggravating evidence beyond a reasonable doubt. McGregor v. State, 885 P.2d 1366, 1385-6 (Okl.Cr.), cert. denied, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995). On appellate review this Court is to determine what role the invalid aggravator played in sentencing, and whether the jury would have imposed the death penalty had they not considered the invalid aggravator. Id. at 1387.
¶ 106 Turning to the mitigating evidence, Appellant presented nine (9) witnesses, including Appellant's ex-wife, her two sisters, Appellant's daughter, his mother and step-father, mental health professionals, and a co-worker. These witnesses testified that Appellant had no significant history of criminal activity; that in committing the murders he acted in response to a strong depression and loss of control; he fully cooperated with police; was contrite and remorseful; that he had made a good adjustment to life in jail and is a positive influence on other prisoners; that the murders were totally out of character for Appellant; that Appellant had always been supportive and responsive to his family; that he worked all of his life; he interceded on behalf of a sister-in-law who believed she was in the process of being assaulted as a teenager; he had been generous to others all his life; and after his parents divorce, he was looked upon by his mother and sisters as the man of the family. This evidence was summarized into thirteen (13) factors and submitted to the jury for their consideration as mitigating evidence, as well as any other circumstances the jury might find existing or mitigating.
¶ 107 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate in Counts I and II. As to Count III, after carefully and independently reweighing the two valid aggravating circumstances against the mitigating evidence, we find beyond a reasonable doubt that the jury in this case would have sentenced Appellant to death even if it had not considered the invalid aggravator. Accordingly, we find the death sentence in Count III to be factually substantiated and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991 § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting modification, the sentences of death for Counts I, II and III and the sentence of life imprisonment without the possibility of parole for Count IV are hereby AFFIRMED.
*984 STRUBHAR, V.P.J., and JOHNSON, J., concur.
CHAPEL, P.J., and LANE, J., concur in result.
LANE, Judge, concur in results.
¶ 1 I would first like to further explain the situation in regard to the transferred intent instruction complained of in Proposition III. One of the experts testified that from his consideration of the total circumstances of the case the wound suffered by Tina was not caused by a ricochet. However, the same expert testified that it was possible that it was indeed a ricochet because of the nature of the wound at the point of entry to her body. The puncture could well have been caused by a bullet that had been flattened due to striking another object before hitting the victim. It is evident that this testimony led the State to want the instruction included. Under these circumstances, especially since the evidence as to a ricochet came about because of cross-examination by defense counsel, the giving of the instruction was not error.
¶ 2 As to the majority's comments on possible prosecutorial misconduct for failure to give proper notice of second stage witnesses and their testimony, I agree that the issue is waived because of a lack of proper objections to preserve the issue. Anything beyond that I consider to be dicta.
¶ 3 I also take exception with some of the results reached by the majority in its discussion of the heinous, atrocious or cruel aggravator. The majority finds that the aggravator applies to the death of Anita because of extreme mental cruelty. Accepting the majority's recitation of the facts in this regard, I do not find sufficient evidence to support this finding. An argument at the front door, working their way into the back bedroom where a brief struggle ensued, Appellant telling her that she and her children were going to die, and then shooting her in the head, all in quick succession, is not enough to support the aggravator. In order to support heinous, atrocious or cruel there must be competent evidence that the death was proceeded by great physical anguish or extreme mental cruelty. Powell v. State, 1995 OK CR 37 ¶ 57, 906 P.2d 765, 781. Mental abuse or torture must be more than basic fright that anyone must experience immediately prior to death. Cheney v. State, 1995 OK CR 72 ¶ 20, 909 P.2d 74, 82. However, after finding that heinous, atrocious or cruel does not apply, I would still affirm the death penalty for this murder. The evidence and circumstances of the remaining aggravators were so strong that I have no doubt that the jury would have returned a verdict of death even when this aggravator is not considered.
¶ 4 As to the victim impact evidence given by Anita's estranged husband and the father of Martise, I would find that any statement other than those about the victims and the impact of their murders on their families was inadmissible. I still maintain the position I took in Ledbetter v. State, 1997 OK CR 5, ¶¶ 1-6, 933 P.2d 880, 902 (Lane, J., concur in result), but I recognize that stare decisis applies.

ORDER DENYING REHEARING AND DIRECTING ISSUANCE OF MANDATE
¶ 1 Appellant was convicted in a jury trial before the Honorable B.R. Beasley, Associate District Judge, of four (4) counts of First Degree Malice Aforethought Murder (21 O.S. 1991, § 701.7), Case No. CF-94-2784, in the District Court of Tulsa County. In Counts I, II and III the jury found the existence of three (3) aggravating circumstances and recommended the punishment of death. In Count IV the jury recommended as punishment life imprisonment without the possibility of parole. The trial court sentenced accordingly. This Court affirmed Appellant's convictions and sentences in Turrentine v. State, 1998 OK CR 33, 965 P.2d 955.
¶ 2 Appellant is now before the Court on a Petition for Rehearing, Rule 3.14, Rules of the Court of Criminal Appeals, 22 O.S.Supp. 1996, Ch. 18, App. According to Rule 3.14, a Petition for Rehearing shall be filed for two reasons only:
(1) That some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or

*985 (2) That the decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument.
¶ 3 Appellant raises one proposition of error claiming this Court has overlooked an issue decisive of the case and duly presented. Specifically, he asserts the Court overlooked his claim that the jury improperly received instructions on the law of transferred intent.
¶ 4 We have reviewed Appellant's allegation and find that he is not entitled to a rehearing. This Court thoroughly considered the allegation of error as it was raised in the appellate brief and our decision is not in conflict with controlling authority from this Court or the United States Supreme Court.
¶ 5 Based upon the foregoing, this Motion for Rehearing is DENIED. The Clerk of this Court is ordered to issue the mandate forthwith.
IT IS SO ORDERED.
NOTES
[1] Appellant's Petition in Error was filed in this Court on April 4, 1996. Appellant's brief was filed October 2, 1996. The State's brief was filed January 30, 1997. The case was submitted to the Court February 4, 1997. Appellant's reply brief was filed February 19, 1997. Oral argument was held November 4, 1997.
[2] These instructions have since been adopted as the uniform instructions on second degree murder. See Oklahoma Uniform Jury Instructions-Cr 4-91 (2nd) and as modified by Willingham v. State, 947 P.2d at 180-1081.
[3] In its appellate brief, the State notes that the term "physical" is omitted from the definition of serious abuse in the new uniform jury instructions. See OUJI-Cr 4-73(2nd ed.) This omission was corrected in the 1997 supplement to the OUJI-Cr (2nd ed.). For future cases, the trial courts are directed to give OUJI-Cr 4-73, with the complete definition of "serious physical abuse."
[4] Jerry Richardson testified to the following:

I, Jerry Richardson, am here today to represent my family, Anita, Tina and Martise, who met with an untimely death on June 4, 1994. They were shot in the head, a tragic and wrongful death.
Anita Richardson, my wife, was shot in the back of the head while on the phone with 911. Martise Richardson, age 13, was shot in the forehead while protecting his mother. This was a brutal murder for no reason.
My son did not get his chance to fulfill his goals or dreams. His ultimate goal was to become the best basketball player he could be and to play pro basketball player  pro basketball for the Lakers. He was robbed of that chance in life, not due to sickness or illness, but by a fatal gunshot wound which silent (sic) him forever at the tender age of 13 years old.
And now, last but not least, I would to like to address  I would like to address your attention to a special lady, my daughter, Tina. Kenneth shot her and left her for dead. Tina was 22 years old, but was much like your average teenager. She was born with many trials and obstacles in her life.
You see, Tina was a deaf/blind child. During her life, she endured six open heart surgeries, but throughout her struggles, she never gave up the dream of becoming a tennis player, becoming a teacher and tennis player. Even though Tina was my stepdaughter, from the age of three years old, I was the only father she had ever known.
I say to you, the jury, that from this day until the day I die  I shall die, in my heart Tina will remain my daughter and I will remain her father. I love my children, Tina and Martise, dearly and their mother loved them, too.
Anita was a good mother to both of my children. I will never forget that awful day and what happened, but with the help and grace of God I've learned to take it one day at a time. Anita cannot be present today speak in her behalf. Martise and Tina cannot be present to speak in their behalf.
In addition to myself, Anita, Martise and Tina are survived by Dorothy and Lonzo Gardner, parents and grandparents. Dorothy has suffered depression and physical ailments because of the death of her daughter and grandchildren. They are also survived by Teresa Youngblood, sister and aunt, Curtis Youngblood, brother-in-law, Ashley and Bria Youngblood, niece and cousin to the victims.
Please let justice be done in the murders of my family, the murders of our family, Anita, Martise and Tina. I only dream and hope today is that the truth will come out and that justice will prevail, then maybe our family can rest in peace. (Tr. 1005-1009).